# Illinois Official Reports

## Appellate Court

---

### *People v. Plummer*, 2021 IL App (1st) 200299

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY PLUMMER, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-20-0299 |
| Filed | August 20, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 91-CR-21451; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Joey L. Mogul and Brad J. Thomson, of People's Law Office, and David M. Shapiro, of Roderick & Solange MacArthur Justice Center, both of Chicago, and Megha Ram, of Roderick & Solange MacArthur Justice Center, of Washington, D.C., for appellant.<br><br>Myles P. O'Rourke, Special State's Attorney, of Chicago (Andrew N. Levine, Ariel Yang-Hodges, and Elisabeth Gavin, Assistant Special State's Attorneys, of counsel), for the People.<br><br>Daniel J. Schneider, of Edelson PC, of Chicago, for *amici curiae* Chicago Torture Justice Center *et al.* |

Michael A. Scodro, Elaine Liu, Sara Norval, and Sarah I. Rashid, of Mayer Brown LLP, of Chicago, for *amici curiae* Robert W. Bennett *et al*.

Panel JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Johnny Plummer, appeals the second stage dismissal of his amended successive postconviction petition on the State's motion. On appeal, defendant contends that the trial court's dismissal should be reversed where defendant made a substantial showing to proceed to a third stage evidentiary hearing based on newly discovered evidence corroborating his claims of police torture and a *Brady v. Maryland*, 373 U.S. 83 (1963), violation. For the following reasons, we reverse and remand for third stage proceedings.

¶ 2                                I. BACKGROUND
¶ 3                        A. Pretrial and Trial Proceedings
¶ 4    Following a bench trial, the court found defendant guilty of first degree murder, attempted first degree murder, and aggravated battery with a firearm in the death of Michael Engram (decedent) and the shooting of D'Andre Dyson (D'Andre). Accordingly, the court imposed a cumulative sentence of 50 years. The following facts were detailed by this court in defendant's direct appeal. *People v. Plummer*, 306 Ill. App. 3d 574 (1999).

¶ 5    The shooting occurred on August 11, 1991, and defendant, who was 15 years old at the time, was arrested shortly thereafter. Prior to trial, a hearing on defendant's motion to suppress statements was held. *Id.* at 576. The evidence established that Chicago police Detective Michael Kill was investigating the homicide of Anthony Phillips, near the location of 5817 South Union Avenue on August 18, 1991, around 6:30 p.m. Detective Kill saw defendant near the scene, and defendant gave him information regarding the Phillips death.[1] *Id.* Defendant was allowed to leave the scene. *Id.*

¶ 6    On August 19, 1991, at around 3:30 a.m., Detective Kill was again near the scene of the Phillips's homicide talking to other witnesses. *Id.* He saw defendant walk by and asked defendant and other witnesses to accompany him to the police station: defendant agreed. Upon arrival at the Chicago Police Department Area 3 station (Area 3), the witnesses were put in separate interview rooms where they each gave a statement about Phillips's murder. *Id.* Defendant was not given his rights under *Miranda* (*Miranda v. Arizona*, 384 U.S. 436 (1966)) because he was being treated as a witness. *Plummer*, 306 Ill. App. 3d at 576. At 6 a.m. Detective Kill and Detective John Halloran (Detective Halloran) interviewed defendant at

_____

[1]The two attended a party right before Phillips's death and were known associates.

which point he implicated a suspect in that case. *Id.* at 576-77. They gave the witnesses the option of staying at the station or coming back when they picked up the suspect. *Id.* at 577. The witnesses all elected to stay at the station. *Id.*

¶ 7 Later that morning, Chicago police Detective Stanley Turner received an anonymous call telling him that "Smokey" murdered decedent. *Id.* The caller described "Smokey" as a young black man, of dark complexion, tall, and from around the area of 59th Street. *Id.* Decedent was shot at 60th Street and Morgan Street on August 11, 1991, at around 4 p.m. *Id.* Detective Turner learned that an individual named "Smokey" was in the station already. *Id.* Defendant admitted that he was known as "Smokey" but denied any involvement at approximately 4 p.m. on August 19, 1991. *Id.* Detective Turner testified that defendant was not handcuffed and looked coherent and appeared relaxed. *Id.*

¶ 8 At 6 p.m. Detectives Kill and Kenneth Boudreau spoke with defendant again about the Phillips murder, and they left the station. *Id.* The detectives confirmed that the witnesses would stay at the station in the event that the suspect was found. *Id.* Detective Kill did not know defendant was known as "Smokey" and did not know about his potential involvement in the murder of decedent. *Id.* Detective Kill denied treating defendant in an abusive manner and stated that defendant never asked for an attorney or his mother. *Id.*

¶ 9 At 7 p.m., Detective Halloran returned to the police station to give food to the witnesses when he was informed that they had an eyewitness to the decedent's murder. *Id.* Detective Halloran denied treating defendant in an abusive manner and testified that defendant did not ask to see anyone. *Id.* Detective Halloran denied any involvement with the investigation into decedent's death. *Id.*

¶ 10 At 8:30 p.m., defendant stood in a lineup and was positively identified as decedent's killer. *Id.* at 577-78. Afterwards, defendant was informed of his *Miranda* rights by Detective Devon Anderson. *Id.* at 578. Defendant confessed to the murder of decedent to Assistant State's Attorney (ASA) William Marback and agreed to give a signed confession. *Id.*

¶ 11 At 12:35 a.m. on August 20, 1991, ASA Marback again advised defendant of his *Miranda* rights and wrote out defendant's statement of confession in his presence. *Id.* Defendant insisted on adding an additional statement that indicated that he shot the decedent because he was informed that decedent put a hit on him, which ASA Marback transcribed. *Id.* At 3:50 a.m. on August 20, 1991, defendant gave a witness statement to ASA Marback and Detective Halloran regarding the Phillips murder. *Id.* ASA Marback testified that defendant stated he was treated "fine" and was allowed to use the bathroom and was given a soda and a cigarette.

¶ 12 Defendant testified that between 9 and 10 a.m. on August 18, 1991, two detectives took him to the police station where he was placed in a small room and handcuffed to a ring in the wall. *Id.* Six hours later, he was driven to the scene of Phillips's murder. *Id.* at 579. He was taken back to the station and given one hamburger. *Id.* Defendant asked Detective Kill if he could go home or talk to his mother, and Detective Kill just laughed in defendant's face. *Id.* Detective Kill proceeded to hit defendant in the face, stomach, and side, pulled his hair, and then left the room. *Id.* Another detective, who defendant did not identify, came into the room and took his shoes. *Id.* That detective came back and claimed that the shoes matched the prints from the scene. *Id.* Another unidentified officer told defendant he would get 40 years in prison, where he would be raped. *Id.* Defendant testified that he only made the confession in decedent's case and witness statements for the Phillips case because he was told he could go home if he did so and because he was tired and afraid. *Id.*

- 3 -

¶ 13    On cross examination, defendant acknowledged that when he was talking about the Phillips murder, he was not handcuffed. *Id.* He agreed to go to the scene of Phillips's murder; however, when he returned to the station, he was then accused of murdering Phillips. *Id.* He asserted that he was never given any *Miranda* rights by any member of law enforcement but did receive his *Miranda* rights from ASA Marback. *Id.* Defendant stated that he informed ASA Marback that he was abused, but ASA Marback did not do anything. Defendant testified that "about a half day" after he gave his witness statement, Detective Kill hit him once in the face and three times with a flashlight. *Id.* Defendant testified that he did not know what was in the statement he signed, but he signed it because he was afraid and tired of being in the police station. *Id.* He testified that he signed that statement after he signed the witness statement regarding the Phillips murder. *Id.* He testified that when he was taken to the juvenile temporary detention center on August 20, 1991, he told the doctor there that the police had beaten him. *Id.* When defendant was shown photographs taken of him during the lineup, he admitted that there were no marks on his face. *Id.*

¶ 14    On redirect examination, defendant testified that both Detective Kill and his partner hit him. He also clarified that he was hit by Detective Kill's partner prior to signing his confession.

¶ 15    Defendant's mother, Jeanette Plummer, testified that she visited defendant on August 21, 1991, at the "Audy Home" and observed that his back and face were swollen and that he had dark marks on his upper chest. *Id.* at 580. However, on cross examination, she acknowledged that defendant's lineup photos showed no visible injuries. *Id.*

¶ 16    Dr. Lawrence Heinrich, a clinical psychologist, testified that he performed a series of tests on defendant in the spring of 1993 and reviewed prior medical reports, and he determined that defendant suffered from schizo-affective disorder. *Id.* In Dr. Heinrich's opinion, stress and prolonged interrogation would cause defendant to do anything to escape the situation, although he would not understand what he was doing. *Id.* He also testified that sometimes defendant did not tell the truth. *Id.*

¶ 17    In rebuttal, the State presented Dr. Albert Stipes, a psychiatrist, who testified that he met with defendant in 1992. *Id.* After reviewing police reports, defendant's statements, and his social and psychiatric history, Dr. Stipes determined that defendant could knowingly and understandingly waive his *Miranda* rights, that he was fit and sane at the time of the incident, and that there was no evidence of a schizo-affective disorder. *Id.* He also stated that he believed that defendant was malingering and exaggerating or faking the symptoms of mental illness. *Id.* at 580-81.

¶ 18    The trial court denied defendant's motion to suppress statements finding that he was not physically, psychologically, or emotionally coerced. *Id.* at 581.

¶ 19    At trial, two witnesses identified defendant as the shooter. *Id.* Roger Tyler testified to seeing defendant prior to and after the crime, while hearing several gunshots being fired in between. *Id.* Reiko Dyson (Dyson) testified that she was in a candy store with decedent and her son when defendant came in the store and opened fire. *Id.* The shooting resulted in decedent's death and her son being hit in the finger by gunfire. *Id.*

¶ 20    ASA Marback testified that defendant made a written confession detailing why he committed the murder. *Id.* The statement indicated that defendant purchased a gun for protection after an argument with decedent. *Id.* On August 11, 1991, when he saw decedent at the candy store, decedent threatened defendant, and defendant began shooting at him. *Id.*

¶ 21 Defendant was found guilty by the trial court of first degree murder, attempted first degree murder, and aggravated battery with a firearm and sentenced defendant to concurrent prison terms of 50 years, 25 years, and 25 years, respectively. *Id.* at 582.

¶ 22 B. Direct Appeal

¶ 23 On direct appeal, defendant contended that (1) the trial court erred in denying his motion to suppress statements where the evidence established that he was denied access to his mother and family once his status changed from witness to suspect, (2) the youth officer failed to perform his duties to safeguard defendant's rights, and (3) there was medical evidence that he was easily susceptible to the influence of others. *Id.* This court held that the statements made by defendant were freely and voluntarily given and not against the manifest weight of the evidence. *Id.* at 589. Additionally, we found that a juvenile held in custody without a warrant does not lose their protections under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-4(6)(a) (West 1992)) until charged with an offense that is enumerated under the Juvenile Court Act. *Plummer*, 306 Ill. App. 3d at 583. Defendant's conviction and sentence were affirmed. Our supreme court denied defendant's petition for leave to appeal on October 6, 1999.

¶ 24 C. Initial Postconviction Petition

¶ 25 Defendant filed his initial *pro se* postconviction petition on September 4, 1996, alleging ineffective assistance of trial counsel. Defendant alleged that defense counsel was ineffective for failing to subpoena detectives he claimed abused him, failing to call two witnesses who could have corroborated the abuse he received, failing to introduce evidence of his poor school grades, and failing to file a motion to suppress the lineup identification when he was the only person in the lineup with a dark complexion. On December 26, 1996, defendant supplemented his petition with an allegation that Detectives Kill and Boudreau perjured themselves at trial. Defendant amended his petition several more times, and the court assigned counsel. The trial court ultimately granted the State's motion to dismiss, finding that defendant failed to establish ineffective assistance of appellate or trial counsel. Defendant appealed, and we affirmed the dismissal on June 10, 2009. *People v. Plummer*, No. 1-06-1552 (2009) (unpublished order under Illinois Supreme Court Rule 23). Our supreme court denied defendant's petition for leave to appeal on September 30, 2009.

¶ 26 D. *Habeas Corpus* Petition

¶ 27 Defendant filed a federal *habeas corpus* petition in the Northern District of Illinois on September 29, 2010, alleging that he was physically and mentally coerced into making a confession by detectives. On September 1, 2011, the court denied defendant's petition as well as the certificate of appealability. *Plummer v. Rednour*, No. 10-C-6225, 2011 WL 3876908 (N.D. Ill. Sept. 1, 2011).

¶ 28 E. Class Action Petition

¶ 29 On October 29, 2012, defendant, along with Vincent Wade, filed a putative class action petition in the circuit court of Cook County on their own behalf and as representatives of the putative class of then-incarcerated persons who were coerced into confessing to serious crimes

by former Commander Jon Burge and his associates and were convicted and sentenced to prison based on those coerced confessions. The named defendants sought certification of the class and a third stage postconviction evidentiary hearing for each class member based on their respective claims of coercion and or torture. The petition to certify the class was denied on March 12, 2014. However, a special master was appointed to identify all valid claims of coerced confessions. The special master determined defendant's claim to be valid and recommended that an attorney be appointed to represent him. On June 17, 2015, the trial court further ruled that individuals with a valid Burge-related postconviction claim were entitled to appointed counsel to assist them in filing successive postconviction petitions wherein they were entitled to rely on newly discovered evidence of systemic torture and abuse under Burge's command.

¶ 30                                    F. Successive Postconviction Petition

¶ 31        On February 29, 2016, defendant filed a motion for leave to file a successive postconviction petition. The petition alleged (1) newly discovered evidence showing that interrogating Detectives Kill and Boudreau were involved in a pattern and practice of torture, physically abuse, and other acts of coercion to elicit incriminating statements under the command of Burge in Areas 2 and 3; (2) the State committed a *Brady*, 373 U.S. 83, violation when it withheld exculpatory evidence regarding the practices of the interrogating detectives' practice and pattern of torture and physical coercion; and (3) a fundamental fairness claim regarding the use of defendant's confession at trial when it was physically coerced. The trial court granted defendant's motion on June 15, 2016. On September 28, 2016, the State filed a motion to dismiss.

¶ 32        On June 18, 2019, defendant filed a motion for leave to file an amended successive postconviction petition after uncovering information that appeared beneficial to his case, which the trial court granted. The petition restated the allegation that Detectives Kill and Boudreau used torture and abuse to elicit incriminating evidence and added the following new allegations: (1) newly discovered evidence of a federal investigation involving decedent that the State withheld, which could have provided information of other suspects who may have been responsible for the murder of decedent in violation of defendant's due process rights; (2) newly discovered evidence eroding the identification of defendant as shooter; and (3) the cumulative effect of all of the errors alleged deprived defendant of his fundamental right to due process. Defendant attached three affidavits and other supporting evidence in support of his amended successive postconviction relief petition.

¶ 33                                    1. Affidavit of Reiko Dyson

¶ 34        In defendant's postconviction petition, defendant attached the affidavit of Reiko Dyson (Dyson) dated May 13, 2019, who originally identified defendant as being a shooter in a lineup and at trial. Dyson averred that on August 11, 1991, she was dating the decedent and had been in a relationship with him for years. Dyson, decedent, and her son, D'Andre, went to the candy store at 6038 South Morgan Street. While in the store Dyson observed the shooter outside of the door of the candy store (he did not come in), and she remembered him as being a tall man with "dark skin." Dyson averred that she did not get a good look because the shooting happened very quickly, and she was focused on her son. Dyson was unable to see the shooter's face, she only saw him through with her peripheral vision. When Dyson picked defendant out of the

lineup, he appeared to resemble the shooter the most and noted he had dark skin. Dyson averred that she was unable to say for sure that defendant was the shooter.

### 2. Affidavit of Spencer Riley

Defendant attached the affidavit of Spencer Riley dated December 16, 2016. Riley averred that in August 1991, he and defendant were friends, and they were detained and taken to Area 3 in handcuffs by Detective Kill. Riley stated that he was familiar with Detective Kill because he would often take him in for questioning if a crime happened in their neighborhood. While at Area 3, Detective Kill informed Riley that he knew they had nothing to do with the crime and that there was another suspect. Riley asserted that Detective Kill informed him that there was a federal investigation occurring and they thought the murder was an "in house" job, meaning the murder was done by the people decedent was in the drug business with. Riley was free to leave that day while defendant remained; he had not been in contact with defendant since that day.

### 3. Evidence of a Pattern of Police Abuse and Misconduct

Defendant attached an abundance of exhibits containing affidavits, complaints, and investigations, as well as trial and appellate decisions concerning other defendants who alleged they were abused by Burge and his associates from the 1970s onward. Specifically, defendant attached numerous reports on the allegations of abuse made by the Torture Inquiry and Relief Commission (TIRC), the Office of Professional Standards (OPS), the City of Chicago, and the special state's attorney.

### 4. Evidence of *Brady* Violation

The following documents were uncovered by the instant postconviction counsel, after issuing subpoenas to various agencies. These documents were created around the time of defendant's interrogation.

### a. Affidavit of Special Agent Zehme

On April 17, 1991, Richard Zehme, a special agent with the Internal Revenue Service (IRS) criminal investigation division in Chicago, provided an affidavit wherein he attested that his job was to conduct investigations on individuals who derived income from illegal sources. Agent Zehme began his investigation of decedent and Anthony Battiste in May 1990. This investigation was conducted jointly with the Drug Enforcement Administration (DEA). Agent Zehme's investigation revealed that within two years Battiste had acquired property, cars, and furnishings amounting to $200,000 despite not having any legitimate source of income. Agent Zehme's investigation revealed that property located at 6238 Beaver Dam Road, Matteson, Illinois was the center of the illegal operation. Even though Battiste resided at the property, the real estate records revealed that the property was owned by decedent and all utility bills were in decedent's name.

¶ 43                              b. Memo of Agents Zehme and Pat Maloney

¶ 44        On August 13, 1991, IRS agents Zehme and Pat Maloney interviewed Tony Nelson. Detective Boudreau was also present. Nelson stated that "the word on the street" was that Battiste had decedent killed because he feared decedent would cooperate with federal authorities.

¶ 45                                   c. Memo of Agent Zehme

¶ 46        On August 19, 1991, agent Zehme met with decedent's brother, Johnny Engram (Johnny). Johnny stated that he and his brother grew up with Battiste and that he used to work for Battiste but stopped in May 1985 because he was not getting paid. Johnny proceeded to outline the inner workings of Battiste's drug operation including several men who worked for Battiste. Johnny also indicated that Battiste was told by his attorney that a person named "Big Wayne" was cooperating with authorities, at which point, Battiste told his men to shoot at Big Wayne's people.

¶ 47                                   d. Report of Agent Zehme

¶ 48        On February 25, 1993, agent Zehme assembled a report that revealed that a search warrant of the home that decedent lived in was issued on August 19, 1991. The search revealed drugs, paraphernalia, and large amounts of money.

¶ 49                              5. The State's Motion to Dismiss

¶ 50        On September 5, 2019, the State filed an amended motion to dismiss defendant's amended successive postconviction petition arguing that (1) all claims were barred by *res judicata* because (a) fundamental fairness should not be relaxed when the trial record contradicted defendant's claim that certain detectives were involved in decedent's investigation and when the detectives in question left Area 3 prior to the time defendant claimed they abused him and (b) the record suggested that defendant made a voluntary statement; (2) defendant had not alleged a *Brady* violation petition when (a) Detectives Kill and Boudreau were not involved in the interrogations and (b) defendant did not allege specific evidence of another person who had the opportunity, motive, and intent to kill decedent; (3) defendant's challenge to the reliability of Dyson's eyewitness and trial testimony with an affidavit that only stated that she was unsure of her former identification of defendant was not a recantation and was cumulative of her testimony on cross examination by defendant and not newly discovered; and (4) because all of defendant's claims were barred by *res judicata*, he was not entitled to a claim of cumulative error.

¶ 51        Defendant subsequently filed a response[2] arguing that (1) he was entitled to relitigate the claim that his confession was involuntary when there was newly discovered evidence of police misconduct corroborating his claim; (2) *People v. Patterson*, 192 Ill. 2d 93 (2000), and its progeny clearly demonstrate that the evidence contained in defendant's successive postconviction petition was relevant, material, and would likely lead to a different result if presented at a new motion to suppress hearing; (3) newly discovered evidence shows that Detectives Kill and Boudreau both participated in the investigation of decedent's murder

---

[2]The response is provided in the record but does not have a file date stamped on it.

despite their denials, and therefore the evidence showed (a) Detectives Kill and Boudreau interrogated defendant regarding decedent's murder and (b) Detectives Kill and Boudreau physically coerced defendant into confessing; (4) the State's arguments did not accept as true the allegations of defendant as required and instead based their motion on assertions of disputed testimony of detectives whose credibility is at issue; (5) defendant does not have to establish that he sustained visible physical injuries to demonstrate that Detectives Kill and Boudreau coerced his confession; (6) the State improperly argued that the confession was exculpatory and therefore, voluntarily given; (7) defendant presented a cognizable *Brady* violation when he presented evidence demonstrating that Detectives Kill and Boudreau failed to produce evidence of other suspects who may have been responsible for the murder of decedent.

¶ 52  The State filed a reply in further support of its motion to dismiss.[3] In addition to restating their initial contentions, the State further argued that defendant's *Brady* claim was conclusory as to what Detectives Kill and Boudreau knew and their conduct.

¶ 53  On January 9, 2020, the trial court conducted a hearing on the State's amended motion to dismiss. The State argued that the defendant's amended successive postconviction petition was a "repeat effort" to allege claims against Detectives Kill and Boudreau, who were not involved in the custodial interrogation of defendant. The State contended that defendant's claim that he had newly discovered evidence of the detectives' pattern and practice of police brutality must fail because he did not make a substantive claim and was barred by *res judicata*. The State maintained that the issue of police brutality was raised at trial and in his previous postconviction petition. The State reminded the court that Detective Kill testified at the pretrial hearing that he was listed in the police report as being involved in the decedent's case in error. According to the State, Detective Anderson took defendant's statement at approximately 8:30 p.m. on August 19, 1991, following a lineup where defendant was identified. Detective Kill had left the police station that day at approximately 7 a.m. The State asserts that Detective Kill was only involved as an investigator for the Phillips murder investigation, not the decedents.

¶ 54  The State also pointed out that Detective Turner testified that he received the anonymous tip that identified defendant as the suspect in the decedent's murder. When he brought this to defendant's attention, at approximately 4 p.m. on August 19, 1991, defendant denied any involvement. Thus, the State proposed that defendant's denial at 4 p.m. demonstrated how his will was not overborne by Detectives Kill and Boudreau, who were not alleged to have been in the building at that time.

¶ 55  Additionally, the State alleged that the claim lacked materiality because defendant did not specifically assert that Detective Boudreau was involved in the abuse. The State argued that the new evidence of Detective Boudreau's mere presence at Nelson's interview regarding decedent's murder did not demonstrate that he was assigned to this case. The State also argued that the claims of physical injury were not reflected in the photos of defendant that were submitted at the suppression hearing and his mother did not testify to seeing any visible injuries on defendant.

¶ 56  Next, the State argued that defendant's *Brady* claims should fail because the State never withheld information pertaining to a pattern and practice of police brutality by Detectives Kill and Boudreau and such evidence was not widely known to prosecutors during pretrial

---

[3]The time stamped date is not visible on the copy provided in the record.

proceedings in the early 1990s. According to the State, defendant failed to cite any evidence in support of his theory that the State had knowledge and withheld said information.

¶ 57 Finally, the State insists that defendant's third claim should be declined because defendant failed to prove that the State had knowledge and an obligation to share said knowledge of the federal grand jury investigation involving the decedent. The State argued that evidence of several men under Battiste's "command" that look similar to defendant still does not clearly identify a potential suspect who had motive to kill the decedent.[4] The State argued that, even though defendant provided a list of potential suspects, witnesses identified him as the shooter, and thus, the claim lacks materiality because knowing this information would not have made a difference in the case.

¶ 58 Defendant argued that his first claim, which raises the issue of whether Detectives Kill and Boudreau were part of the decedent's murder investigation, cannot be dismissed because it involves a disputed fact that must be decided by the trier of fact. Defendant alleges that just because the detectives were not present when defendant made the statement does not mean that defendant was not coerced. Defendant suggests that this requires an examination of not who took the statement but rather who did the interrogation, citing *People v. Rogers*, 413 Ill. 554 (1953), as support. Defendant posits that if the newly discovered evidence showing that Detective Kill lied regarding his participation in the decedent's murder investigation, that Detective Kill actually interrogated Riley, and that Detective Kill had a pattern and practice of abuse had been presented at the motion to suppress hearing, the motion to suppress the statement of confession would have been granted.

¶ 59 In regard to defendant's second claim of a *Brady* violation, for failure to disclose, defendant rested on the arguments made in his response to the States motion to dismiss.

¶ 60 For defendant's third and last claim, he argued that the undisclosed evidence revealed that there was an alternative suspect. Defendant attested that prior to his death the decedent was engaged in criminal activity with Battiste, a governor in the Gangster Disciples; both of whom were being investigated by federal authorities. Defendant argued that the eyewitness described the shooter and that the description matched four men who worked for Battiste. Defendant referred the court to evidence of a meeting wherein a federal agent and Detective Boudreau interviewed a witness two days after decedents death. The witness told them that it was a widely known rumor that Battiste had decedent killed to prevent him from testifying against him. Defendant explained that Battiste benefited by not only eliminating the potentially damning testimony of the decedent; but he also had the benefit of blaming the money laundering and narcotics charges on decedent. Battiste was ultimately found not guilty of the narcotics charges. Accordingly, defendant believed that this evidence was exculpatory in nature and should have been disclosed by the State.

¶ 61 Defendant argued that he had newly discovered evidence of an affidavit from Riley who stated that he was brought in with defendant for questioning about the Phillips murder. While questioning Riley, Detective Kill stated that he knew about the federal investigation and that he believed that the decedent was murdered by someone he did business with. This evidence was never before raised and therefore was not barred by *res judicata*. Defendant presents that

---

[4]Defendant listed several men (Michael Battiste (Battiste's brother), Darnell Reese, Shawn Reese and Edward Reese) and provided their respective criminal backgrounds, as well as mugshots, and argued that they were all possible suspects who could have committed the crime on behalf of Battiste.

this evidence also impeaches Detective Kill because it demonstrates that he was not being honest in the suppression hearing when he indicated that he had nothing to do with the investigation of decedent's death. Defendant argued that this evidence was material to defendant's guilt because he should have had the right to show that other people matched the description of the shooter. Lastly, defendant argued that he should have had this evidence available to him at trial in order to demonstrate that the investigation was inadequate because they were aware of other potential suspects and did not attempt to investigate them.

¶ 62    In rebuttal, the State indicated that Detective Kill treated defendant as a witness in the Phillips murder investigation and that the defendant's statement was voluntarily given. Additionally, the affidavit by Riley cannot be newly discovered because he was known by the time of trial and an affidavit by him would lack the required due diligence. Lastly, the State argued that they did not know the details of the federal investigation or what involvement Detective Boudreau had with that investigation.

¶ 63    Defendant responded that Riley was in fact a known witness, however, there were no reports regarding his interrogation. It was not defendant's burden to know or figure out that Detective Kill had interrogated Riley with respect to the decedent's murder. As far as the defendant knew, Riley was just a potential witness to defendant's alleged abuse and whether defendant was brought to the police station involuntarily.

¶ 64    The trial court found that there was no question that Detectives Kill and Boudreau engaged in a pattern and practice of abuse. However, on August 19, 1991, Detective Kill left the police station at 7 a.m. At 4 p.m., defendant denied any involvement in the death of decedent. The trial court determined that, even if there was torture, it had been attenuated when he denied involvement at 4 p.m. According to the court, this denial showed that defendant's will had not been overborne. The trial court noted it was only after he was identified in a lineup that his statement was taken by persons other than Detectives Kill and Boudreau. The trial court ruled that Detectives Kill and Boudreau's past bad acts were not relevant nor material. The trial court found that it was not known what the decedent was going to testify to in the federal investigation because there is nothing in the record to reflect that; to assume either way would be mere speculation. The trial court indicated that if there was any evidence to demonstrate that Battiste killed the decedent, he would have faced additional federal charges. Lastly, the trial court found that common sense would dictate that a defense attorney would ask a witness who was referenced in a police report what was discussed between that witness and a detective. The trial court dismissed the amended successive postconviction petition.

¶ 65    Following defendants notice of appeal, we granted leave to file a brief to Mayer Brown LLP and Edelson PC (collectively, *amici*), who both individually represent a coalition of groups and individuals who are interested in this matter. Additionally, this court heard the oral arguments of the State and defendant on July 8, 2021.

¶ 66                                    II. ANALYSIS

¶ 67    On appeal, defendant contends that this court should reverse the second stage dismissal of his successive postconviction petition where he made a substantial showing of (1) newly discovered evidence of police torture by Detectives Kill and Boudreau corroborating his claim of being tortured into making a confession and (2) the State committing a *Brady* violation by concealing evidence that proved that there were alternative suspects in the murder investigation of decedent. The arguments contained in the *amici* briefs largely echo that of defendant, and

- 11 -

we will not dissect them here but will make specific reference thereto as necessary.

¶ 68                                      A. Standard of Review

¶ 69     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)) provides a statutory remedy for defendants who claim that their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a direct appeal but rather a collateral attack on a prior final judgment. *Id.* "The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22.

¶ 70     The Act contemplates the filing of only one petition without leave of court. *People v. Sanders*, 2016 IL 118123, ¶ 24. Any claim not presented in an original or amended petition is waived. *Id.* There are two exceptions for which the bar on successive petitions can be relaxed. *Id.* The first exception is when the petitioner satisfies the cause and prejudice test. 725 ILCS 5/122-1(f) (West 2014). The second exception is known as the fundamental miscarriage of justice exception. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). That exception requires the petitioner to demonstrate actual innocence. *Id.*

¶ 71     The Act provides a three-stage process for adjudicating petitions. *People v. Cotto*, 2016 IL 119006, ¶ 26. At the first stage, the trial court determines whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2014). If the petition is not dismissed at first-stage proceedings, it advances to the second stage. *Cotto*, 2016 IL 119006, ¶ 26. At the second stage, the trial court must determine whether the petition and any accompanying documentation makes a "substantial showing of a constitutional violation." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 33. At a third stage evidentiary hearing, the trial court serves as the fact finder; the court's function is to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. *Id.* ¶ 34. At a postconviction hearing, a defendant bears the burden of proof to show a denial of a constitutional right by the preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 72     At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and in the event the trial court dismisses the petition at that stage, we generally review that decision *de novo*. *People v. Childress*, 191 Ill. 2d 168, 174 (2000).


                              B. Newly Discovered Evidence of Torture

¶ 73     Defendant contends that evidence continues to be unearthed, regarding the pattern and practice that Detectives Kill and Boudreau engaged in while working at Area 3 under Burge's command, and has provided such evidence in his amended successive postconviction petition. Specifically, defendant cites the TIRQ, OPS, and the City of Chicago as sources who have confirmed, cataloged, and deemed credible the allegations of the abuse by Detectives Kill and Boudreau.

¶ 74     Defendant contends that evidence of systematic torture entitles him to a third stage evidentiary hearing where he may present evidence of abuse and argue for a new suppression hearing. In support, defendant has demonstrated that he (1) has consistently maintained for

- 12 -

decades that as a 15-year-old child he was tortured when detectives beat him with a flashlight, pulled his hair, and hit him while he was handcuffed to a wall and radiator; (2) the claims were strikingly similar to other claims of torture such as (i) Clinton Welton, Andre Wilks, and Marcus Wiggins who recalled being struck in the head or body while in custody and (ii) Peter Williams who was handcuffed to a radiator for hours; (3) Detectives Kill and Boudreau are identified in other credible allegations of torture; and (4) his allegations are consistent with OPS findings of systematic torture where the abuse was committed at Area 3 under Burge's command and that the torture was systematic and the culture was prevailing citing *People v. Wrice*, 406 Ill. App. 3d 43, 53 (2010), as support. Both defendant and the *amici* rely on *Wrice*, which formulates the principle that misconduct of this type is always material and can never become harmless error. The *amici* further contend that it can find no case, state or federal, that has held that the admission of a confession obtained with the degree of abuse that defendant experienced was harmless error. As such, the *amici* analogizes the decision of the trial court to a regression back to the beginning of Burge-related cases where black victims were required to present indisputable evidence to prove that they were abused.

¶ 75    The *amici* contend that Burge-related postconviction proceedings make clear that the trial court's decision warrants reversal. Illinois precedent has established that "a pervasive pattern of criminal conduct by police officers is enough for courts to reconsider the voluntariness of a defendant's confession." (Internal quotation marks omitted.) *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 189.

¶ 76    Defendant and the *amici* both contend that the abuse suffered by defendant had not been attenuated by the passage of time, as the trial court had found. Defendant contends that the abuse is not rendered less material or relevant because Detectives Kill and Boudreau were not present at the time defendant made the statement. The *amici* agree and contend that case law demonstrates that coercion is still present even when those who tortured defendant were not present for the confession, citing *Patterson*, 192 Ill. 2d at 111-18, as support. The *amici* urge this court to hold that the alleged attenuation does not extinguish petitioner's right to show the coercive effect of Burge-era abuse. Defendant reminds the court that violence at any time while in custody is enough to render a confession involuntary, especially when it was obtained after a 39 hour interrogation, citing *Rogers*, 413 Ill. at 564-65 (1953), for support. Lastly, defendant reasons that a finding of attenuation was unsupported by the record and could only be found if a fact-specific inquiry and hearing are conducted.

¶ 77    The State contends that the alleged "new" evidence was cumulative of defendant's previous allegation of torture and thus would not have changed the result of the suppression hearing. At the suppression hearing the trial court weighed defendant's claim against the evidence presented by the State and determined that defendant's confession was voluntary. The State relies on the following sequence of events: defendant denied involvement in the murder at approximately 4:30 p.m. on April 19, 1991, he was then identified in a lineup, after which he made a statement implicating himself and gave a handwritten confession wherein, he included additional information as to his motive. The State contends that the exculpatory language in the written statement as well as ASA Marback having followed proper procedure when taking the statement is an indicator that the statement was less likely coerced. The State further asserts that defendant's calm and relaxed demeanor throughout his custody, his being offered a cigarette and the opportunity to use bathroom, as well as the lack of any visible physical injury were also indicators of a voluntary confession.

¶ 78    Next, the State contends that defendant is barred by *res judicata* from raising this claim as defendant raised this issue in both the direct appeal and the postconviction petition. The State notes that this court previously determined that the claims of defendant were illogical because he claimed that Detective Kill abused him after he obtained a witness statement. Additionally, this evidence is cumulative to what was attached to his ineffective assistance claim. The State claims that defendant has not demonstrated that the new evidence is sufficient to warrant the relaxation of *res judicata*, citing *Patterson*, 192 Ill. 2d at 139, as support. According to the State, defendant has not shown that the evidence is substantially new evidence, material or conclusive. The evidence is not new because evidence of such was presented along with his previous ineffective assistance claim, the evidence is not material or conclusive when defendant's confession was taken outside the presence of those he alleged abused him, and the evidence presented is general in nature. Likewise, Riley's affidavit is not newly discovered because he was a witness known at trial and the affidavit itself does not contain any new information. Additionally, the evidence could not be material because the record shows that Detective Kill was not involved in the decedent's murder investigation.

¶ 79    Defendant's reply brief contends that the presentation of Riley's affidavit and the pattern and practice evidence constitute substantially new evidence that is material in nature. Defendant contends that the State previously acknowledged that this evidence was new and therefore this argument is waived. Additionally, defendant contends that much of the new evidence did not exist until after his initial petition was dismissed on September 30, 2009. Defendant references the following evidence, among others, that has subsequently emerged: (1) Burge was convicted of perjury in 2010 when the court found that Burge and his subordinates used methods of torture "designed to inflict pain and instill fear while leaving minimal marks" (*United States v. Burge*, 711 F.3d 803, 806 (7th Cir. 2013)); (2) former ASA Johnson revealed that Detective Boudreau told suspects what to say before the court reporter arrived and those individuals were later exonerated; (3) in 2012, 2014, and 2017, TIRC found substantial evidence demonstrating that Detectives Kill and Boudreau engaged in a pattern of practice of torture in cases involving Gerald Reed, George Anderson, Anthony Jakes, Arnold Day, Demond Weston, and Clayborn Smith; and (4) in 2016, reparations were awarded to people from the City of Chicago for the abuse that was inflicted upon them.

¶ 80    Defendant's reply brief contends that the new evidence is not immaterial because the passage of time did not cure the abuse and did not render the confession voluntary. Additionally, Detectives Kill and Boudreau's presence were not needed at the time defendant signed the confession in order to validate his claims of torture. Defendant maintains that instead of addressing the factors contained in *Patterson*, which defendant believes he satisfies, the State focuses on how the evidence would not have changed the result of the suppression hearing because of other aspects that rendered the confession voluntary. Defendant argues this is improper because the custodial interrogation was not brief and lasted for 39 hours; the 4:30 p.m. denial did not demonstrate that his will was overborne because by that time he had already told ASA Marback about the abuse and realized that no one was going to help; the exculpatory statement was consistent with "minimization," which is a manipulative interrogation technique whereby officer's elicit confessions by downplaying the moral consequences while the legal consequences remain the same; the absence of physical evidence does not indicate a lack of abuse and rejecting defendants mother's testimony that he was abused requires a credibility determination, which is impermissible at this stage; and even if ASA Marback followed

procedure when writing the confession, he still failed to act when defendant informed him he was abused and was not present when defendant was interrogated.

¶ 81 Lastly, defendant insists that he has consistently maintained since the suppression hearing that both Detectives Kill and Boudreau beat him before he confessed. Additionally, any confusion as to the timing of the abuse and his confession should be understandable considering the fact that defendant was a 15-year-old who was experiencing a traumatic event, citing *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 125, as support.

¶ 82                                                    1. *Res Judicata*

¶ 83 First, we will consider whether defendant's claim of abuse and or torture is barred by *res judicata* based on his initial postconviction petition. *Res judicata* provides that "any issues which could have been raised on direct appeal, but were not, are procedurally defaulted and any issues which have previously been decided by a reviewing court are barred." *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). Defendant's initial postconviction petition alleged ineffective assistance of counsel. However, in this instant appeal, defendant presents newly discovered evidence to support his allegations of torture. These issues are clearly not the same, and thus, the newly discovered evidence could not have been previously decided by the postconviction court. See *id.* Additionally, the multitude of evidence that demonstrates a pattern and practice was not created at the time defendant raised his ineffective assistance claim in his initial postconviction petition. Defendant could not have raised this particular issue sooner; defendant has not waived this issue. See *id.* Therefore, defendant's amended successive postconviction petition cannot be barred by *res judicata* based on his previous postconviction petition.

¶ 84 Next, we must determine if defendant's claim is barred by *res judicata* based on his direct appeal. The doctrine of *res judicata* is relaxed "where the facts relating to the issue do not appear on the face of the original appellate record." (Internal quotation marks omitted.) *Tyler*, 2015 IL App (1st) 123470, ¶ 158. "The standards addressing whether new evidence is sufficiently substantial so as to relax *res judicata* are the same standards used to determine whether newly discovered evidence should result in a new trial." (Internal quotation marks omitted.) *Id.*

> "[F]or new evidence to be sufficient to relax *res judicata* and warrant an evidentiary hearing, 'the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier.' " (Internal quotation marks omitted.) *Id.* (quoting *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 61).

¶ 85 Here, defendant contends that newly discovered evidence of systematic torture supports his allegations of torture and challenges the voluntariness of his confession. On direct appeal, defendant alleged that the trial court erred in denying his motion to suppress because (1) during interrogation, defendant was subjected to a coercive atmosphere when his status changed from witness to suspect and he was denied access to his mother and family; (2) the youth officer failed to secure his rights; and (3) there was medical evidence that he was susceptible to the influence of others. Although defendant has not made the exact same argument, he has previously challenged the voluntariness of his confession based on coercion and therefore is

- 15 -

subject to being barred by *res judicata*. Thus, we must examine whether the evidence is substantially new so as to relax this bar.

¶ 86                                    a. Newly Discovered Evidence of Torture

¶ 87     The question we are faced with is whether the evidence defendant provided in his successive petition was "discovered since trial" and whether it is "of such character that the defendant in the exercise of due diligence could not have discovered it earlier." (Internal quotation marks omitted.) *Id.* ¶ 162. Here, although there were many complaints of alleged abuse in the 1990s, it was not until the 2000s when these allegations began to be not only recorded but also investigated, compiled, and substantiated.

¶ 88     As such, defendant attached evidence of allegations,[5] that were later found to be credible, from others who alleged that they too were abused by Detectives Kill and Boudreau. On September 26, 1991, six teenagers (ranging from the ages of 13 to 19) named Imari Clemons, Diyez Owens, Welton, Wiggins, Jesse Clemons, and Damoni Clemons (collectively, "Clemons case") were interrogated by various officers including Detectives Kill and Boudreau. Cassandra Clemons, mother of the Clemons brothers, accompanied her sons to the Area 3 police station. While she waited, she heard their screams, but she was denied access to them. Those six teenagers alleged that they were handcuffed to the wall, smacked, beat with fists, punched in the neck, beat with flashlights, shocked with electricity, had their hair pulled, had their fingers pulled back, and were not allowed to see anyone. Both Detectives Kill and Boudreau told OPS they observed no incidents of abuse to anyone. OPS reported that Detective Boudreau failed to follow proper procedure when he questioned the minors without a parent present. However, OPS concluded its findings on November 10, 1994, with no finding of abuse because they could not identify the specific abusers. Nevertheless, a Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2014)) response from the City of Chicago disclosed that some of those teenagers received reparations from the City of Chicago in January 2016.

¶ 89     On August 21, 1991, 15-year-old George Anderson was arrested and later taken to Area 3. He was interrogated by Detectives Kill, Boudreau, and Halloran. While being questioned, he was subjected to beatings which including being kicked in the wrist that was handcuffed to the wall. He was threatened and subjected to more attacks by different officers until he signed the confession, which he ultimately did. TIRC investigated his claims and in 2017 and determined that there was sufficient credible evidence in his case to warrant further review.

¶ 90     On February 4, 1992, Arnold Day was 18 years old and claimed he was arrested at a friend's house. During the arrest, the officers handcuffed him, stomped him in the back of the head, and took him to Area 3 where he was interrogated by Detective Boudreau, Officer Judd Evans, and Detective William Foley. They typically questioned him separately, however, while Detective Boudreau was questioning Day, Detective Foley entered the room and grabbed him by the neck, choked him, and told him he was going to throw him out of the window if he did not confess. Detective Boudreau did nothing. His claims were investigated by TIRC, which determined in 2014 that there was sufficient credible evidence in his case to warrant further review.

---

[5]Defendant attached an abundance of allegations, we will identify those that are most analogous to defendant's allegations.

¶ 91    On September 15, 1991, police received an anonymous call implicating a tall, skinny, black male as being a shooter in a murder. Soon after, police received another anonymous call indicating Jakes, who was 15 years old at the time, knew something about the murder. Sometime thereafter, Jakes was arrested and taken to Area 3 where he was interrogated by both Detectives Kill and Boudreau. Jakes was slapped, threatened to be thrown out the window, burned with cigarettes, and told that they would have his family killed by the Latin Kings if he did not confess. Detectives Kill and Boudreau supplied Jakes with information about the murder to give to the ASA, who Jakes eventually confessed to. When Jakes made this confession, he had been at Area 3 for more than 16 hours. Jakes was subsequently convicted. However, in 2014, TIRC found his allegations of coercion credible. Consequently, Jakes's conviction was later vacated, and he received a certificate of innocence.

¶ 92    Williams was arrested when he was 19 years old and taken into Area 3 for questioning about a murder that occurred on October 14, 1990. Williams was interrogated and alleged that he was beaten by Detectives Boudreau and Kill and other officers for hours. Williams alleged that he was beaten with a blackjack and a pistol was put in his mouth while the trigger was pulled. Ultimately, defendant was cleared of all charges when it was determined that he was in jail at the time of the murder. Williams's allegations were detailed in a civil suit[6] filed by Harold Hill, who also alleged he was abused by Detective Boudreau and others. Hill was subsequently convicted of the same crime Williams was charged with but was ultimately exonerated with DNA evidence in 2005.

¶ 93    Now, we will examine whether the aforementioned cases are newly discovered. The abuse resulting in the Clemons case occurred in September 1991, only a month after defendant's encounter with Detectives Kill and Boudreau causing their respective criminal proceedings to occur almost simultaneously. OPS conducted an investigation and concluded its report on November 10, 1994, regarding the Clemons case. OPS reportedly declined to find the allegations credible because they were unable to ascertain who actually committed the abuse. Nevertheless, in 2006, the defendant was able to ascertain records via FOIA that confirm that the City of Chicago paid the Clemons case victims reparations for the abuse they experienced. These records gave credibility to the claims of the Clemons case whereas the OPS report did not.

¶ 94    The aforementioned FOIA documents were not available until over a decade after defendant's trial. Likewise, even though the Williams abuse occurred prior to defendant's abuse, the evidence supporting the Williams allegations did not come into existence until after defendant's trial. Similarly, the 2006 report by the special state's attorney, which catalogues the investigation of allegations of abuse, was completed over a decade after defendant's trial occurred. TIRC investigated and found allegations in the cases of Anderson, Day, and Jakes, spanning from 2014 to 2017, to be credible; this occurred over two decades after defendant's trial.

¶ 95    In the case at bar, defendant has presented as newly discovered evidence, not the complaints themselves, but the investigations and reports that gave the complaints credibility. It is clear that these reports were not discoverable at the time of defendant's trial because they

---

[6]Defendant attached Williams's civil suit, *Hill v. City of Chicago*, No. 06-C-06772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009), against the City of Chicago and the various detectives involved, including Detective Boudreau, to his petition.

did not actually exist until decades later. Given the sensitive nature of police investigations and the sheer scale of the criminal justice system, it is unreasonable to expect defense counsel to discover whom these individual detectives were abusing unless counsel interviewed every suspect who was detained by them. *Tyler*, 2015 IL App (1st) 123470, ¶ 162 (" 'beyond interviewing anyone who had ever been a prisoner at Area 2, we can conceive of no manner in which [defense counsel] reasonably could have obtained this information' " (quoting *Patterson*, 192 Ill. 2d at 109)); *People v. Reyes*, 369 Ill. App. 3d 1, 20 (2006) ("the various allegations against [the detective] could have been discovered prior to trial only if defense counsel had interviewed every person ever detained by [the detective]"). In fact, some of the complaints are of such a character that they mirror the claims raised by defendant here. *Tyler*, 2015 IL App (1st) 123470, ¶ 162. As a result, we consider defendant's evidence of investigations, reports, and FOIA records to be newly discovered for the purposes of relaxing the doctrine of *res judicata.*

¶ 96                                        b. Conclusive

¶ 97        Evidence is conclusive if it would probably lead to a different result when considered alongside the trial evidence; that is, it places the trial evidence in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *Coleman*, 2013 IL 113307, ¶ 97. One similar incident of misconduct by the same detective can demonstrate "intent, plan, motive, and could impeach the officers' credibility" *Tyler*, 2015 IL App (1st) 123470, ¶ 186 (citing *People v. Banks*, 192 Ill. App. 3d 986, 994 (1989)). Defendant's amended successive postconviction petition undoubtedly presents evidence of a systematic pattern of similar abuse by Detectives Kill and Boudreau, some of which are detailed above. This alleged pattern of abuse could be used to impeach Detective Kill's credibility and bolster defendant's credibility. The proposed evidence places such a weight on the scales of justice that it significantly undercuts this court's confidence in the guilty verdict. Thus, we find that this evidence is so conclusive in nature, that if these reports were allowed at defendant's motion to suppress, it would have likely changed the outcome on retrial.

¶ 98                                 c. Material and Noncumulative

¶ 99        Detective Kill's credibility was specifically at issue when he implied that he did not abuse defendant by stating that he was not involved in the case. The specific tactics that were used and later substantiated in the other cases (such as hitting teenagers with flashlights, beating them while they are handcuffed, pulling their hair, and threatening to have them or their families assaulted and/or killed) would cause a reasonable trier of fact to question the truthfulness of Detective Kill's statement. This evidence is duly material because it references abuse similar to that which defendant in this case complained of regarding Detectives Kill and Boudreau. The finding of coercion by physical and mental abuse would call into question the validity of the confession, which was the linchpin of the case against defendant. Hence, we believe that when considered along with the evidence introduced at trial, evidence of substantiated abuse similar to what we have here, and by some of the same officers, is so material that it would probably have led to a different result. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 100       In addition to being material, the evidence must be noncumulative. Noncumulative evidence is evidence that adds to what the jury has already heard. *Id.* Here, the trier of fact heard limited testimony from defendant and his mother regarding abuse that could not be seen

in pictures. The court did not hear evidence consisting of the OPS, TIRQ, or FOIA reports or numerous civil cases that substantiated other, yet similar, allegations of abuse against Detectives Kill and Boudreau. It is indisputable that this newly discovered evidence would do more than just add to or bolster the evidence already presented at trial: this evidence could change the defense's case entirely. *Id.*

¶ 101        d. Newly Discovered Evidence of Riley's Affidavit

¶ 102  Defendant contends that Riley's affidavit is newly discovered with respect to Detective Kill's statements regarding the federal investigation that decedent was involved in. The State counters that the affidavit of Riley is not newly discovered because it adds nothing new and reiterates that Detective Kill participated in the investigation and extracted a confession. Defendant however rebuts that he never used Riley to support his contention that Detectives Kill and Boudreau were involved in the federal investigation.

¶ 103  We find the affidavit of Riley to be newly discovered because although the witness was known at trial, the information was not. *Tyler*, 2015 IL App (1st) 123470, ¶ 162. Although defense counsel talked to Riley about how defendant was abused, Riley never discussed how Detective Kill disclosed the existence of another suspect during Riley's interrogation. Accordingly, Riley's role at the trial was limited to his observation of Detective Kill hitting defendant with a flashlight but did not include the contents of the interrogation during which Detective Kill told Riley about the federal investigation that decedent was involved in and how there were other suspects. Further, we decline to find that defense counsel failed to discover this additional evidence for lack of due diligence. *Id.* Defense counsel should not be tasked with asking every perceivable question to elicit information from a witness in order to uncover potential wrongdoing of the State or its officers.

¶ 104  Riley's affidavit is material because it corroborates the evidence that Detective Kill, and the State by extension, was informed of alternative suspect. *Id.* It is not cumulative in nature because there was no other testimony or evidence admitted regarding the federal investigation or other suspects. Riley's affidavit is conclusive in that it directly contradicts Detective Kills testimony that he was not involved in the decedents case and that his name was listed on the police report in error. Riley's testimony could have demonstrated that Detective Kill was significantly more involved in decedents investigation than he admitted and is of a conclusive nature that could have changed the result of the motion to suppress if known. *Id.*

¶ 105  For the aforementioned reasons, we find that defendant's newly discovered evidence is sufficient to relax the *res judicata* bar.

¶ 106        2. Substantial Showing of a Constitutional Violation

¶ 107  Having determined that defendant's claims are not barred by *res judicata*, we next examine whether he made a substantial showing of a constitutional violation. In summary, defendant alleges that the cumulative effect of all the matters alleged in the petition deprived him of his fundamental due process right to a fair trial. Specifically, defendant and the *amici* contend that the trial court erred in determining that any abuse inflicted on defendant was attenuated by the passage of time. Defendant contends that his confession was inadmissible despite the passage of time because he was still scared and just that he just wanted to go home. Thus, defendant claims that even if the officers were not present when his confession was made, the evidence must be suppressed citing *People v. Thomlison*, 400 Ill. 555, 569 (1948), as support. Lastly,

defendant insists that the finding of attenuation requires factual and credibility determinations that are not permitted at the second stage of a postconviction relief petition.

¶ 108    The State points to factors which they contend are indicative of voluntariness, such as ASA Marback followed procedure in obtaining defendants confession; defendant stated that he was treated okay, defendant was given the opportunity to use the bathroom and smoke cigarettes, defendant denied any involvement in the murders at 4 p.m., defendant confessed after he was identified in a lineup; defendant had a calm demeanor, defendant had no visible injuries, and defendant added exculpatory language his written statement indicating that he committed the crime in self-defense.

¶ 109    The *amici* and defendant assert that the standard the trial court applied when granting the second stage dismissal was regressive and placed an incredible burden on defendants. We agree. We have consistently held that the only thing that is required for a court to reconsider the voluntariness of a confession is a "pervasive pattern of criminal conduct by police officers." (Internal quotation marks omitted.) *Tyler*, 2015 IL App (1st) 123470, ¶ 189. Defendant has included in his petition incidents that are relevant and related to the issues in his case not only because the abuse was similar (hitting teenagers with flashlights, beating them while they are handcuffed, pulling their hair, and/or threatening to have them or their families assaulted), but they were also perpetrated by some of the same officers from the same police stations and were incredibly close in time to one another. These similarities are more than mere coincidence and establish a pattern of systemic abuse by Detectives Kill and Boudreau who interrogated defendant and evidently worked on his case. Although Detective Kill denied involvement in decedent's murder at the motion to suppress, he nevertheless admitted to interrogating defendant about the Phillips investigation and both Detective Kill's and Detective Boudreau's names were on the police reports as working this case.

¶ 110    We disagree with the State regarding several of the factors that they allege were demonstrative of a voluntary confession. The State refers to the fact that ASA Marback followed procedure when he took the confession. Simply stating that he followed procedure does not identify what the procedure entailed such that it does not permit the court to assess whether the procedure was a proper indicator of voluntariness. The State argues that defendant stated that he was treated "fine" to ASA Marback and points to the fact that defendant was given the opportunity to use the bathroom and smoke cigarettes as evidence of voluntariness. Allowing the defendant to use the bathroom, when he was at the station for 39 hours, should be considered human decency, not evidence of voluntariness. Further, defendant testified that he signed the confession after the lineup because he was tired and just wanted to go home. The remaining factors, except for lack of visible injury, which will be discussed below, seem to be consistent with his goal of attempting to get out of the police station without incurring more abuse.

¶ 111    The State persists that the absence of visible injury is an indicator of voluntariness. Defendant has been adamant that he was hit in the abdomen, his hair was pulled, and he was threatened with rape and physical violence. Defendant also provided evidence of abuse to others that included beatings to the groin, abdomen, and legs, among other things. These kinds of attacks would not be readily visible in a photograph: perhaps intentionally so. Additionally, the strikes to the face that were reported by defendant might not have been visible depending on how long after their occurrence they were viewed. Hence, we are not persuaded that the

absence of visible injury in this case is a strong indicator that defendant's confession was voluntary.

¶ 112    We also disagree with the State and trial court that defendant's confession was voluntary because the police officers were not present when he made his confession. The effects of abuse committed by law enforcement does not walk away with the offending officers, it very well may linger. See *Thomlison*, 400 Ill. at 569. Further, defendant included evidence of such lingering effects in his petition when he presented evidence of Dr. Heinrich's statements that defendant was left scared and willing to do anything to get out of that encounter. However, the trial court found that the effects of torture had been attenuated at the time of the confession. We agree with defendant that essentially the trial court discounted Dr. Heinrich's assessment of defendant's state of mind, amounting to a credibility determination by the court. However, at the second stage, the trial court is limited to determining whether the petition and any accompanying documentation makes a "substantial showing of a constitutional violation." (Internal quotation marks omitted.) *Domagala*, 2013 IL 113688, ¶ 33. Thus, the weighing of Dr. Heinrich's testimony was impermissible at that stage. The trial court may make such credibility determinations only at the third stage. *Childress*, 191 Ill. 2d at 174.

¶ 113    Accordingly, we find that defendant's newly discovered evidence is likely to change the result of the motion to suppress and possibly the outcome of the underlying trial. See *Tyler*, 2015 IL App (1st) 123470, ¶ 164.

¶ 114                                      C. *Brady* Violation

¶ 115    Defendant contends that newly discovered evidence shows that the State violated his due process rights under *Brady*, 373 U.S. at 87, by concealing (1) the existence of a federal criminal investigation into the decedent and Battiste, (2) that decedent was scheduled to testify before a grand jury about Battiste's criminal activity, (3) that decedent did not testify before the grand jury at the scheduled time and was murdered three days later, (4) that Battiste and his men were suspected of committing the murder, and (5) that several men who worked for Battiste fit the description of the murder suspect. By concealing these matters, defendant contends that the State failed its affirmative duty to disclose exculpatory evidence and the trial court erred in shifting the burden to defendant when it found the evidence to be immaterial.

¶ 116    Defendant contends that the concealed evidence was favorable to defendant because it was exculpatory and impeaching. Defendant advises us that the concealed evidence demonstrated that there was another suspect, namely Battiste, who had a clear motive to want the decedent murdered. That motive was consistent with the timeline of the shooting, it was known throughout the community, and the description of the shooter matched descriptions of people who worked for Battiste. Defendant contends that there was no physical evidence tying defendant to the crime, eyewitness Tyler did not see him shoot anyone, eyewitness Dyson admitted her original identification was not reliable, and defendant's alleged motive of trying to strike first in an attempt of self-defense while conveniently receiving a gun the day before he coincidentally ran into decedent was not a strong one.

¶ 117    Defendant contends that the concealed evidence could have impeached Detective Kill's testimony at the suppression hearing regarding not knowing much about the case despite being listed as an arresting officer along with Detective Boudreau. However, defendant asserts that correspondence from the IRS noted that Detective Boudreau was in direct contact with federal agents who told the detectives that decedent was murdered by Battiste because of his

involvement in the pending federal matters. Defendant insists that this knowledge of an alternative suspect by Detectives Kill and Boudreau is further evidenced and supported by the conversation that took place between Riley and Detective Kill during interrogation regarding other suspects and the federal investigation.

¶ 118 As a result of the State's suppression of evidence, defendant contends that he only learned of the evidence when postconviction counsel commenced discovery for the instant petition. Prior to this, defendant did not know of the federal investigation or alternative suspects. Defendant argues that this evidence was material and could have changed the entire case. Defendant complains that the trial court erred in finding that the evidence was not material since there is no way to tell if the decedent were going to testify; what mattered was that Battiste feared he would. Lastly, defendant contends that undisclosed evidence can be the basis of a *Brady* determination, as knowing this information could have allowed defendant to investigate this matter when he was building his defense.

¶ 119 The *amici* characterizes the alleged *Brady* violation as both material and serious. The *amici* contend that detectives collectively (1) were more deeply involved in decedent's murder investigation then they indicated, (2) misled the trial court about their role in that investigation during defendants original suppression hearing, (3) knew firsthand that the federal government had empaneled a grand jury to investigate Battiste and called decedent as a witness to that grand jury, (4) knew that Battiste and decedent were a part of the same gang, in which Battiste had seniority over decedent, and (5) had been told by a witness that Battiste had decedent killed to avoid his cooperation with federal authorities. The *amici* contends that if this were introduced at trial, it could have provided defendant with a well-raised and documented defense by having an alternative suspect to point to.

¶ 120 The State contends that the newly discovered evidence demonstrating that there were other suspects is arguably favorable but speculative. The State contends that defendant did not present evidence that showed that Battiste had other gang members killed in a similar manner and did not show that the two had any altercation or violent argument prior to the murder, citing *Wilson v. Firkus*, 457 F. Supp. 2d 865 (N.D. Ill. 2006), and *People v. Wilson*, 149 Ill. App. 3d 293 (1986), as support. Additionally, defendant failed to demonstrate that there were any alternative suspects in the vicinity of the shooting when it occurred. The State contends the federal investigation was immaterial because of the evidence presented at trial, which included three witnesses providing direct testimony implicating defendant as the shooter.

¶ 121 Defendant's reply brief contends that the standard that the State set forth was incorrect. Defendant is not required to produce evidence of an alternative suspect or evidence of the exact same type as in other cases; rather, defendant was required to show evidence that "is favorable to the accused and material to guilt or punishment," citing *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008), as support. We agree.

¶ 122 In order to demonstrate a *Brady* violation, a defendant must show that "(1) the undisclosed evidence is favorable to [him] because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) [he] was prejudiced because the evidence is material to guilt or punishment." *Id.* We review the trial court's determination for manifest error. *Id.* at 73. This error must be "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Id.* Such evidence must be provided to the defense even if it was "known only to police investigators and not to the prosecutor." (Internal quotation marks omitted.) *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999).

¶ 123	In determining if the undisclosed evidence was favorable to defendant, we must consider whether the undisclosed evidence would have assisted decedent in presenting Battiste as an alternative suspect. *Beaman*, 229 Ill. 2d at 75. "An accused in a criminal case may offer evidence tending to show that someone else committed the charged offense." *Id.* "Evidence of an alternative suspect should be excluded as irrelevant, however, if it is too remote or speculative." *Id.* "Generally, evidence is relevant if it tends to make the existence of any fact in consequence more or less probable than it would be without the evidence." *Id.* at 75-76.

¶ 124	We find that defendant presented sufficient evidence of an alternate suspect, namely Battiste, that had a strong motive to kill decedent. The evidence from the IRS documented not only the investigation but that Battiste was rumored to have had decedent killed and had a history of retaliating against those whom he believed were cooperating with law enforcement. This makes the theory that Battiste could have been an alternative suspect more probable, thereby making the evidence relevant. The evidence cannot be considered remote when the decedent was killed three days after he was scheduled to testify before the grand jury and when Battiste has reportedly ordered the murder of others that he feared might cooperate with federal authorities. Additionally, the new evidence demonstrated that the detectives were aware of the alternate suspect's motive before defendant's conviction because Detective Boudreau sat in on an IRS interview related to the decedents federal case where he was informed that Battiste was a suspect. Defendant's newly discovered evidence demonstrates that Detective Kill was also informed because he mentioned it to Riley. The evidence presented was favorable to defendant because it showed an alternative suspect that he could have presented at trial. *Id.* at 73. Thus, not having the opportunity to present such evidence proved prejudicial to defendant's case.

¶ 125	The parties agree that the Battiste evidence was not disclosed. Defendant only became aware of the federal investigation because of postconviction counsel's document request. Even though the State does not outright concede that it breached its duty, based on the admission that the information was undisclosed, we need not determine whether the failure to disclose was willful or not, because it makes no difference. *People v. Carballido*, 2015 IL App (2d) 140760, ¶ 75.

¶ 126	We must now determine whether the undisclosed evidence was material. Evidence is material if "there is a reasonable probability that the result would have been different had it been disclosed." *Beaman*, 229 Ill. 2d at 78. An accused must show that " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Id.* The evidence presented at trial consisted of a signed confession indicating that defendant murdered decedent before decedent had a chance to kill him and two tentative eyewitnesses. There was no physical evidence linking defendant to the crime. If the evidence of the alternative suspect were presented, it would have shown that Battiste had the motive, propensity, and manpower to murder the decedent.

¶ 127	We find it reasonable to believe, that if the newly discovered information were known to defendant at trial, the outcome could have been different. *Id.* It is not uncommon for defendants to be convicted with far less evidence, however an alternative suspect with motive to kill a federal witness days after he was supposed to testify against him cannot be ignored. We find that the introduction of this evidence would have placed the case in a different light, especially if defendant were given the opportunity to question and investigate those involved. Based on these factors, we hold that the State's suppression violated defendant's constitutional right to

due process under *Brady* and the trial court's dismissal of defendant's *Brady* claim was manifest error.

¶ 128 Lastly, defendant requests that this case be reassigned to a different postconviction judge based on the incorrect standard of review he applied as well as his premature credibility determinations. Under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), the appellate court has the power to make any order that ought to have been made and make other further orders that the case may require. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002). Such powers include the authority to reassign a matter to a new judge on remand. *Id.* A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice. *Id.* at 280. "Allegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant." *Id.* Here, defendant refers to the trial courts improper application of the standard of review and credibility determinations as a presumptive unwillingness to consider the evidence presented by defendant. Defendant does not allege that the judge made any statements or acted otherwise in any way that would imply personal bias toward him. Thus, we find that the defendant has not met his burden because there is no suggestion of unfairness or that reassignment is necessary to best serve the interest of justice. *People v. McAfee*, 332 Ill. App. 3d 1091, 1097 (2002); *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45.

¶ 129                                 III. CONCLUSION

¶ 130 For the aforementioned reasons, we find defendant presented sufficient newly discovered evidence to warrant a third stage evidentiary hearing. First, defendant presented newly discovered evidence that demonstrated that systematic abuse occurred at Area 3. Next, defendant made a substantial showing that his due process rights were violated when the State committed a *Brady* violation. We deny however, defendants request to assign a new judge on remand.

¶ 131 Reversed and remanded.