2023 IL App (1st) 220833-U
No. 1-22-0833

FIRST DIVISION
November 6, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 98 CR 17950 |
| | ) | |
| EVERETTE JOHNSON, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Joanne Rosado, |
| | ) | Judge Presiding. |

JUSTICE Pucinski delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:* We affirm denial of leave to file a sixth successive postconviction petition where defendant did not establish prejudice in the cause-and-prejudice test for his claims that the police detective coerced his statements and ineffective assistance of trial counsel for failing to investigate and present evidence of police coercion committed in other cases to corroborate his claim that his statements were obtained as a result of police coercion.

¶ 2    Defendant appeals the postconviction court's denial of his motion for leave to file a successive postconviction petition filed under the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq*. (West 2018). On appeal, he contends that this cause must be remanded for further proceedings

under the Act because he satisfied the cause-and-prejudice test for allowing a successive postconviction petition to proceed for his claims that his statements were coerced by a police detective and ineffective assistance of trial counsel for failing to investigate and present evidence of coercion by this same detective in other cases. Regarding his claim that Detective Halloran coerced his statements, we find that defendant cannot establish prejudice in the cause-and-prejudice test where his abuse allegations in his postconviction petition did not align with his allegations of abuse in his pre-trial motion to suppress. Regarding his claim of ineffective assistance of trial counsel for failing to investigate and present claims of police coercion committed by Detective Halloran in other cases, we find that defendant cannot establish the prejudice prong of the cause-and-prejudice test where trial counsel's conduct did not fall below an objective standard of reasonableness. At the time of defendant's trial in 2002, no attorney could have predicted that Detective Halloran had been involved in coercive conduct in other cases, which resulted in intense criticism after the Illinois Torture Inquiry and Relief Commission (TIRC) started gathering evidence and holding hearings on these claims. Evidence that Detective Halloran had engaged in coercive conduct in other cases might have swayed the jury, if it were available to defendant at the time of his trial, but defendant is claiming entirely different forms of abuse. This makes his prior and current prejudice claims sufficiently different that we cannot find that he has established prejudice. Therefore, we affirm the circuit court's decision to deny him leave to file his sixth successive postconviction petition.

¶ 3                                                    BACKGROUND

¶ 4        Following a bench trial, defendant was found guilty, based upon an accountability theory, of first degree murder (720 ILCS 5/9(a)(1) (West 1992) and concealment of a homicidal death (720 ILCS 5/9-3.4(a) (West 1987) relating to the death of defendant's 16-month-old daughter,

Oncwanique Tribblet (the victim).[1] At trial, the State presented the account of the victim's death and the disposal of her body through the testimony of Tribblet, through oral and handwritten statements made by defendant after his arrest, and through the testimony of neighbors who reported a vile smell emanating from defendant's apartment during this time period. Although the State sought imposition of the death penalty, the trial court found that defendant was ineligible for the death penalty and sentenced him to consecutive terms of 95 years' and 5 years' imprisonment respectively. The violence that was done to the victim and in disposing of her body is extremely disturbing and will not be repeated here as it was fully explored in our order disposing of defendant's direct appeal. *People v. Everette Johnson*, 1-03-0478 (August 20, 2004). We therefore relate only the facts relevant to the issues in the instant appeal.

¶ 5                          A. Hearing on Motion to Suppress Statement

¶ 6        Defendant filed a pre-trial motion to suppress statements in which he argued that he was not informed of his *Miranda* rights prior to the police interview, and his statements were obtained as a result of "physical coercion illegally directed against the defendant" including that he was deprived of food and sleep for two days, he was verbally threatened repeatedly by various detectives, he was thrown to the ground at his place of employment in the course of his two day interrogation, a "short white detective" threw him against the wall, injuring his thumb, and punched him in the chest and stomach several times. The trial court swore defendant to the contents of his motion, and the parties stipulated that defendant was arrested between 2:00 and 2:30 p.m. on June 10, 1998. The State presented the testimony of Chicago Youth Investigator James Funches,

---

[1] The codefendant, Joan Tribblet (Tribblet) was charged in this indictment but subsequently pled guilty and testified for the State in defendant's bench trial.

Chicago Police Detectives Michael Rose, Edward Adams, and John Halloran, and Assistant State's Attorney Domenica Stephenson (ASA Stephenson).

¶ 7                                       i. Youth Investigator James Funches

¶ 8        Investigator Funches testified that on June 10, 1998, he began to investigate a missing person's report for the victim and interviewed defendant at 3:00 p.m. inside an interview room at Area One Violent Crimes Office. After speaking with him for approximately 30 minutes, Investigator Funches told defendant that the story he related could not be substantiated and suggested that he think about any future statements regarding the victim's disappearance. At 4:00 p.m., defendant was interviewed again, this time inside the youth investigations office, by Investigator Funches along with Chicago Youth Investigator Tim Nolan. Defendant was advised of his *Miranda* rights, defendant indicated that he understood and stated, "I'm going to tell you the truth now." During this interview, defendant stated that the victim was dead, that the victim had died accidentally after ingesting rat poison, and he related what had happened to the victim's body. He also stated that he had been drinking on the day that he buried the victim. Defendant described an area along a roadway, in the median area, where he had dug a grave and buried the victim's body. He further described the area as including a rusty bridge.

¶ 9        After this interview, Investigator Funches arranged to try to locate the victim's body with defendant. Defendant left the police station with Investigators Funches and Nolan and Sergeant Robert Johnson. Defendant directed them to Central Avenue on the west side of Chicago, near Douglas Park. They continued to drive around until they ended up searching an area near Interstate 90/94 in Deerfield, Illinois. At that time, they stopped to purchase food for defendant at a Dunkin Donuts. The search was discontinued after they spoke with an Illinois Department of Transportation tow truck driver at the restaurant to see if he could assist them in determining the

location of the victim's body. They returned to the police station at approximately 10:30 to 11:00 p.m.

¶ 10    Then, Investigator Funches received a telephone call from Tribblet, and he arranged for her to come to the police station. Upon her arrival, Investigators Funches and Nolan interviewed her and then interviewed defendant again at midnight. During this interview, defendant stated that "the reason that we did not find the body was because he had disposed of it in a different location." He stated that the area was close to his grandmother's home, in the back of an athletic field and near a railroad, and the victim's body had been disposed of in a pail and placed under a tarp. Investigator Funches and a different investigator went to see if they could locate the described area while defendant remained in the roll call room at Area One Youth Investigations division.

¶ 11    At 4:00 a.m., he turned the investigation over to Detectives Michael Rose and James Jones of the Area One Violent Crimes Division. Investigator Funches testified that defendant never stated that he wished to remain silent or that he wished to speak to an attorney. He denied that he, or anyone else in his presence, threatened defendant, threw him against a wall, or punched in the chest or stomach.

¶ 12                                    ii. Chicago Police Detective Michael Rose

¶ 13    Chicago Police Detective Michael Rose testified that on June 11, 1998, at 4:00 a.m., Investigator Funches brought defendant and Tribblet to Area One Violent Crimes and informed him of the status of the investigation. At 5:00 a.m., Detective Rose interviewed defendant while Detective Jones interviewed Tribblet. Detective Rose advised defendant of his *Miranda* rights, which he indicated that he understood and agreed to waive. Defendant told him that he had buried the victim but could not remember where he had buried her. Defendant also told him that she died in February of 1998. Detective Rose told him that he did not believe that a man could bury his 16-

month-old daughter and not remember where he had buried her, and that relatives had said that the victim had not been seen since Christmas of 1997. Defendant stated that he "wanted to change his version of events." For the first time, defendant acknowledged that the victim had been killed.

¶ 14    After Detectives Rose and Jones met to exchange information regarding their interviews of defendant and Tribblet, Detective Rose spoke with defendant again at 5:30 a.m. and asked him about additional facts that he learned from Tribblet. Tribblet had provided additional information to Detective Jones about how this crime was committed, and defendant acknowledged that this had occurred. Defendant also provided further details about the disposal of the victim's body. Defendant also stated that he had held her by the neck with her feet "dangling" off the bed when he spanked the victim three times with a ruler, pulled down her diaper and spanked her with a ruler, put her to bed, and that when he woke up six hours later, she was dead. After the interview concluded, Detective Rose spoke with Doctor Nancy Jones of the Cook County Medical Examiner's Office.

¶ 15    At 7:00 a.m., Chicago Police Detective Edward Adams brought defendant's grandmother, Juanita Johnson, into the station. Defendant and his grandmother met inside one of the offices, at which point, defendant told her that "everything was going to be all right, that he told us what happened, and that [she] should cooperate with us." Detective Rose then interviewed Juanita Johnson. Detective Rose denied that he told defendant to tell her to cooperate, or "he would be in trouble[,]" or "he would suffer physical consequences[.]"

¶ 16    At 7:30 a.m., Detective Rose arranged to go to defendant's place of employment in Willowbrook, Illinois, because defendant said that he had disposed of the victim's body parts behind that business and in a wooded area along a riverbank. Defendant directed them to that location and the detectives obtained permission from defendant's supervisors to search the area.

Detective Rose was present for the search, along with two assistant state's attorney, Detectives Jones and Adams, and defendant's supervisors. Detective Rose saw that there was a lot of vegetation, the area was muddy and steeply sloped towards the riverbank, making it difficult to navigate the area. Detective Rose testified that he and the other people searching got mud on their clothing. He stated that he did not go down the slope of the riverbank, but the bottom of his pants and his shoes were muddy. He denied that the mud on his clothing upset him. He denied that defendant was thrown to the ground when they were at Borse Industries.

¶ 17    Afterwards, defendant was going to show the detectives where he bought the container of battery acid and directed them to the area of Central Park and Ogden. Defendant directed them to a small auto parts store, but the owner stated that he did not carry that product and suggested that they try another store down the street. The detective went to the second auto parts store, described the product to the store manager, who handed him a product that fit that description. He took that container to defendant, and he identified it as the product that he had purchased for the battery acid, however, he was not certain if that was the store where he had purchased the battery acid. They returned to Area One.

¶ 18    At 10:45 a.m., Detective Rose interviewed defendant again for a couple of minutes. During that interview, defendant agreed to sign a consent to search his residence at 1619 West 56th Street, second floor rear apartment. Tribblet also signed a consent to search for that residence. Detective Rose denied that defendant refused to sign the consent search form, and that he "slammed him into the wall with [his] muddy pants[.]"

¶ 19    At noon, Detective Rose purchased hamburgers, fries, and a Coke from McDonald's for defendant, and left him alone in the interview room while he ate. Detectives Jones and Adams searched the residence. They returned from the search with a pair of blue jeans belonging to

defendant and an agenda organizer or a personal diary belonging to Tribblet. Defendant identified the blue jeans as his own and said that the holes in the jeans came from mixing battery acid relative to the victim's body.

¶ 20      Then, at 12:50 p.m., Detectives Rose and Jones went to 5818 West Division, which was the apartment where defendant and Tribblet were living at the time of the victim's death. The detectives were looking for Jerome Johnson, a relative of defendant, but was unable to find him. The detectives returned to the police station, interviewed other witnesses, but did not have any further contact with defendant.

¶ 21      At 4:30 p.m., the detectives obtained a search warrant for 5818 West Division, and the search warrant was executed at 6:30 p.m. Detective Rose went to that location, along with Detective Boudreau, Lieutenant Cornfield, Sergeant Zaborek, and some mobile crime lab technicians. The detectives recovered proof of residency for defendant and Tribblet. The mobile crime lab technicians also recovered some additional items, but Detective Rose was unaware of what items were recovered except for a screwdriver and a metal pot or lid. Detective Rose denied that he, or anyone else in his presence, verbally threatened defendant, or threw defendant against the wall, or punched defendant in the chest or stomach. He also denied that defendant told him that he wanted to remain silent and to consult an attorney.

¶ 22                          iii. Chicago Police Detective Edward Adams

¶ 23      Detective Adams testified that on June 11, 1998, he and Detective James Jones went to a second-floor apartment at 1619 West 56th Street, after defendant and Tribblet signed a consent to search that apartment. He recovered a diary or date book from the top of a bedroom dresser, as well as a pair of men's blue jeans on the floor of a closet.

¶ 24                          iv. Chicago Police Detective Brian Halloran

¶ 25 Detective Halloran testified that on June 11, 1998, he arrived at work at approximately 4:00 p.m. received an update as to the status of the investigation from Detective Jones. Before this date, he had not had any prior contact with defendant. At 5:00 p.m. he and Detective Jones interviewed defendant after advising him of his *Miranda* rights. Prior to the interview, defendant had agreed to participate in a polygraph examination, and Detective Halloran was instructed by his supervisor to transport defendant to the police station at 11th and State after the interview concluded at 6:00 p.m. The polygraph examiner had a twenty-minute conversation with defendant and then advised Detective Halloran that defendant had made a statement implicating himself in the victim's murder so there was no need for the examiner to administer a polygraph examination.

¶ 26 They returned to Area One where he spoke to ASA Stephenson and Halloran's partner, Detective Frank Validez. Detective Halloran learned that while he was gone, Tribblet had provided additional information as to how the victim was injured and the disposal of her body. At 8:30 p.m., Detectives Halloran and Jones interviewed defendant again for approximately 30 minutes. Detective Halloran asked defendant if he had used a knife to cut up any other body parts other than what he had previously disclosed, and defendant stated that he had.

¶ 27 At 10:00 p.m., Detective Halloran and Jones were present for an interview conducted by Assistant State's Attorney Markakos. Defendant was informed of his *Miranda* rights, which he agreed to waive. This interview lasted approximately 30 to 45 minutes. At 1:00 a.m., Detective Halloran and Detective FNU Vudrow went to 5818 West Division, observed various items inside the apartment, and spoke with a witness, Pattie Crawford. She gave the detectives an item from her apartment believed to be of evidentiary value to this case. The detectives stayed at the residence for two hours.

¶ 28        At 5:00 a.m., defendant was interviewed by Assistant State's Attorney Domenica Stephenson and Detective Halloran. ASA Stephenson advised defendant of his *Miranda* rights at the beginning of the interview, which lasted 20 to 30 minutes. ASA Stephenson and Detective Halloran interviewed defendant again at 9:30 a.m., which lasted approximately 60 to 90 minutes. Defendant was advised of his *Miranda* rights at the beginning of the interview and agreed to provide a handwritten statement. At 11:20 a.m., ASA Stephenson and Detective Halloran reviewed a handwritten statement prepared by ASA Stephenson.  Defendant, ASA Stephenson, and Detective Halloran signed each page of the 24-page statement. Detective Halloran testified that defendant, in the handwritten statement, attested that he had been treated "very well" by the police and ASA Stephenson; and had been given a cheeseburger, French fries, Egg McMuffin, pop and water; allowed to use the restroom whenever he needed; allowed cigarettes to smoke; and to sleep whenever he wanted. Defendant also attested that "no threats or promises were made to him in exchange for this statement [,] and he was giving the statement "truly and voluntarily[.]" Detective Halloran denied that he, or anyone else in his presence, "verbally threatened" defendant, threw him against a wall, punched him in the chest or stomach, or choked him. He also denied that defendant stated that he wanted to remain silent or that he wanted to consult with an attorney. He testified that he was never alone with defendant inside an interview room but may have been alone with him while accompanying him to the bathroom or when bringing him food.

¶ 29                        v. Assistant State's Attorney Domenica Stephenson

¶ 30        ASA Stephenson testified that she arrived at Area One Police Headquarters between 4:30 and 5:00 a.m. She further testified that she and Detective Halloran interviewed defendant at 5:00 a.m. inside an interview room where she introduced herself and advised defendant of his *Miranda* rights. Defendant agreed to waive those rights, and they conversed for 20 to 30 minutes.

Afterwards, she was present for the court-reported statement of Tribblet at 6:15 a.m. taken by another attorney.

¶ 31 At 9:30 a.m., she and Detective Halloran interviewed defendant again, and defendant agreed to waive his *Miranda* rights. After speaking with him for more than an hour, she explained to defendant the different ways to have his statement documented. Defendant chose to have a handwritten statement. After Detective Halloran left the room, she asked defendant how he had been treated by the police. Defendant said that he had been treated "very well." He stated that he had been allowed to sleep, given food and drink, allowed to smoke and use the bathroom whenever he wanted. He denied that he had received any threats or promises in exchange for his statement and that he had been coerced in any way to give his statement.

¶ 32 As ASA Stephenson was writing out defendant's handwritten statement, she also had to review the court-reported statement of Tribblet. She and Detective Halloran reviewed defendant's handwritten statement with defendant at approximately 2:00 p.m. while in an office area. She had defendant read aloud the first two paragraphs of the statement, and he signed the statement indicating that he had read his *Miranda* rights. Then, she read the entire statement aloud to him, provided him the opportunity to make any corrections to it, initialed the bottom of each page, and signed the last page of the statement. She attached a photograph of defendant to the handwritten statement taken at that time. She testified that defendant never complained to her that he had any physical pain, including pain in his thumbs, or that the detectives had abused him. She also testified that defendant never told her that he asked for a lawyer or that he had asked to remain silent.

¶ 33 After the presentation of this evidence, both parties agreed that the State had overcome their burden of proving that the statement was voluntary. When the trial court asked if defendant would be presenting any witnesses, defense counsel stated that, after conferring with defendant, "[i]t's

our decision at this point in time to rest, for the record." The trial court denied defendant's motion to suppress statements, finding, in part, that there was no evidence "whatsoever that he was physically coerced by being deprived of food or threatened, thrown to the ground, injured, punched and so forth as alleged in the motion." The trial court also found that "there was absolutely no evidence that the police in any way mistreated the defendant or had cause to give any of the statements but that he chose to give." The trial court further found that the length of the time that defendant was present at the police station "was the result of [defendant] giving piecemeal information, and given the unusual…factual aspects in this case, as they unfolded before the police, with the issues of rat poison, whether the child was alive or not, not knowing exactly where the child was buried...the defendant leading the police to various locations to produce the body…" The trial court found that defendant's decision to provide piecemeal statements was not due to defendant's will being overborne but "rather I suppose as part of the soul searching" due to the fact that this case involved defendant's own daughter. Subsequently, in defendant's posttrial motion for a new trial, defendant did not challenge the trial court's decision to deny his motion to suppress statements on the grounds that his statements were physically coerced by the detectives in this case.

¶ 34                                     B. Direct Appeal

¶ 35        On direct appeal, defendant challenged the trial court's decision to deny his motion to suppress his statements on the basis of a lack of probable cause, the trial court's decision to deny him leave to depose Tribblet, and defendant requested that his mittimus be corrected. On August 20, 2004, this court affirmed defendant's conviction and ordered the mittimus corrected. *People v. Everette Johnson*, 1-03-0478 (August 20, 2004).

¶ 36                              C. Initial Postconviction Petition

¶ 37    On June 15, 2005, defendant filed a *pro se* postconviction petition in which he alleged: (1) the indictment did not notify him that he was charged under an accountability theory; (2) his sentence for first degree murder exceeded statutory limits; (3) his trial counsel was ineffective for failing to argue that defendant was in custody for five days "without food, sleep, or counsel…"; (4) he was unlawfully arrested without probable cause; (5) his trial counsel was ineffective for failing to call witnesses and object to his sentence; and (6) appellate counsel was ineffective for failing to raise these claims. On June 29, 2005, the trial court summarily dismissed defendant's petition.

¶ 38    Defendant appealed the summary dismissal of his postconviction petition solely on the basis that he stated the gist of a meritorious claim of ineffective assistance of appellate counsel where counsel failed to raise the issue of the impropriety of his extended-term sentence. On February 9, 2007, this court affirmed the trial court's summary dismissal of defendant's petition. *People v. Johnson*, (1-06-0189). Defendant sought leave to appeal to the Illinois Supreme Court, and on May 31, 2007, his petition was denied. *People v. Johnson*, 224 Ill.2d 584 (2007).

¶ 39                    D. Federal *Habeas Corpus* Petition

¶ 40    On September 12, 2007, defendant filed a petition for writ of *habeas corpus* in the United States District Court in which he sought relief on five grounds: (1) the trial court erred in denying his motion to quash arrest and suppress evidence; (2) the trial court erred in denying his request to depose Tribblet; (3) his trial counsel was ineffective for refusing to permit him to testify at trial; (4) his appellate counsel was ineffective for failing to argue that Detective Wolters gave perjured testimony; (5) his appellate counsel was ineffective for failing to argue that his sentence was excessive; and (6) the State failed to disclose their plea agreement with Tribblet. The district court appointed counsel for defendant, however, counsel subsequently filed a motion to withdraw, and

the court granted the motion. *Johnson v. Pierce*, 2010 U.S. Dist. LEXIS 103982, * * 9, 10, 14. On September 24, 2010, the district court denied defendant's *habeas* petition. *Id.* at * * 10-27.

¶ 41                         E. First Successive Postconviction Petition

¶ 42        On July 29, 2009, defendant filed a motion for leave to file his first successive postconviction petition in which he argued that: (1) the police coerced statements from Tribblet by keeping her children from her; (2) the police illegally interrogated defendant's children; (3) the State failed to prove defendant guilty beyond a reasonable doubt; (4) he was wrongly convicted of the lesser-included offense of aggravated battery; (5) ineffective assistance of trial counsel for failure to raise these claims before the trial court; and (6) ineffective assistance of appellate counsel for failure to raise these claims on appeal. *People v. Johnson*, 2012 IL App (1st) 100622-U, ¶ 2. The Honorable Thomas V. Gainer denied defendant leave to file, and defendant's subsequent motion to reconsider. Defendant appealed, but his appellate counsel filed a motion to withdraw, under *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *Id.* ¶ 3. This court found that defendant filed his motion to reconsider over 30 days after the postconviction court denied leave to file, so that the postconviction court lacked jurisdiction to consider his motion and this Court lacked jurisdiction for "his appeal from the circuit court's order denying that motion." *Id.* ¶ 7.

¶ 43                         F. Second Successive Postconviction Petition

¶ 44        On April 26, 2013, defendant filed his *pro se* motion for leave to file his second successive postconviction petition in which he challenged his extended term sentence. After the circuit court judge denied defendant leave to file his successive postconviction petition, this Court affirmed and granted appellate counsel's *Finley* motion. *People v. Johnson*, 2015 IL App (1st) 133728-U.

¶ 45                         G. Third Successive Postconviction Petition

¶ 46     On January 30, 2015, defendant filed his *pro se* motion for leave to file his third successive postconviction petition in which he alleged he was actually innocent based on forensic lab results not shared by his trial counsel, he was arrested without probable cause, and the seizure of his children "affected [his] legal interest as a father, and arrestee." Defendant's motion for leave to file his third successive postconviction petition was denied, and, after defendant sought leave to appeal, this Court affirmed and granted appellate counsel's *Finley* motion. *People v. Johnson*, 2015 IL App (1st) 133728-U.

¶ 47                    H. Fourth Successive Postconviction Petition

¶ 48     On June 17, 2016, defendant filed his *pro se* motion for leave to file his fourth successive postconviction petition in which he alleged that a media interview of Tribblet was evidence of his actual innocence, and that his sentence was disparate to that of Tribblet. Defendant's motion for leave to file his fourth successive postconviction petition was denied, and, after defendant sought leave to appeal, this Court affirmed and granted appellate counsel's *Finley* motion. *People v. Johnson*, 2018 IL App (1st) 163144-U.

¶ 49                    I. Fifth Successive Postconviction Petition

¶ 50     On November 30, 2017, defendant filed his *pro se* motion for leave to file his fifth successive postconviction petition in which he alleged that he was subjected to double jeopardy, he was improperly sentenced to an extended sentence pursuant to a statute not in effect at the time in which the offense was committed, whether his sentence violated *Apprendi*, and ineffective assistance of appellate counsel. Defendant's motion for leave to file his fifth successive postconviction petition was denied, and, after defendant sought leave to appeal, this Court affirmed and granted appellate counsel's *Finley* motion on November 4, 2020. *People v. Johnson*, No. 2020 IL App (1st) 181460-U.

¶ 51                                    J. Section 2-1401 Petition

¶ 52        Defendant also filed a petition for relief from judgment pursuant to 735 ILCS 5/2-1401(c). In

his petition, dated February 7, 2019, defendant alleged that he had newly discovered evidence of

his actual innocence consisting of letter from a reporter showing that Tribblet made statements

inconsistent with her trial testimony during a subsequent interview. Defendant's motion was

denied on June 28, 2019.

¶ 53                              K. Current Successive Postconviction Petition

¶ 54        On April 11, 2022, defendant filed his sixth successive postconviction petition in which he

alleged that his confession was coerced and "the product of being tortured by detective [sic] Rose

and John Halloran. They both engaged in a practice of misconduct to make defendant sign a

consent to form [sic] search and a false confession." As to Detective Halloran, defendant alleged

that when defendant refused to sign the prepared handwritten statement, this detective "viciously

and repeatedly choked and threatened to continue doing physical harm to him…" and defendant

only agreed to sign the statement because he was fearful of "further physical abuse…" Defendant

also argued that his trial counsel was ineffective for inadequately investigating whether Detectives

Rose and Halloran had physically abused him.

¶ 55        Regarding the element of cause in the cause-and-prejudice test for filing a successive petition,

defendant alleged that, until the decision in *People v. Peoples*, 2020 IL App (1st) 161088-U, "no

court had ruled that Halloran participated in torturing suspects. It had only been alleged." He

further alleged that he subsequently made a request for documents through FOIA and received

information from TIRC relating to the cases involving Detective Halloran.  As to the element of

prejudice, defendant stated that he previously "attempt[ed] to raise a [sic] issue related to detective

[sic] Halloran's abuse in a 2-1401 petition but defendant never received any response." He further

alleged that the evidence in this case "rested solely on believing the detectives and ASA's prepared handwritten version of events."

¶ 56        As to his claim of ineffective assistance of trial counsel, defendant alleged that he "told his attorney all about the physical abuse. However, trial counsel never investigated the detectives involved in abusing defendant prior to filing his motion." He also alleged that it was common knowledge by the Public Defender's Office of the physical abuse committed by detectives working under John Burge." Defendant attached, in part, the documents he received from TIRC, which consisted of a letter from TIRC acknowledging the receipt of his FOIA request on January 28, 2022, and a summary of complaints against Detective Halloran.

¶ 57        On April 20, 2022, the Honorable Joan Rosado denied defendant leave to file his sixth successive postconviction petition, without providing any further comment.

¶ 58                                              ANALYSIS

¶ 59         On appeal, defendant argues that the circuit court erred in denying his motion for leave to file a successive postconviction petition under the Illinois Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2018)). He contends that he made a *prima facie* showing of cause and prejudice for his claim that his statements were obtained as a result of coercive conduct by Detective Halloran and that his trial counsel was ineffective for not supporting defendant's claim at trial that his statements was coerced with evidence that Detective Halloran had been involved in the systemic abuse of suspects.

¶ 60        The Act provides a statutory mechanism for a criminal defendant to assert that there was a substantial denial of his or her rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a)(1) (West 2018). The Act contemplates the filing of only one petition. *People v. Lusby*, 2020 IL 124046, ¶ 27; 725 ILCS 5/122-3 (West 2018) ("Any claim of substantial

denial of constitutional rights not raised in the original or an amended petition is waived.") As a result, a defendant faces "immense procedural default hurdles when bringing a successive postconviction petition." *People v. Davis*, 2014 IL 115595, ¶ 14. These hurdles are lowered only in very limited circumstances so as not to impede the finality of criminal litigation. *Id.*

¶ 61 There are two bases upon which the bar against successive proceedings will be relaxed. *People v. Edwards*, 2012 IL 111711, ¶ 22. "The first basis for relaxing the bar is when a petitioner can establish 'cause and prejudice' for the failure to raise the claim earlier." *Id.* The second exception is known as the "fundamental miscarriage of justice' exception, which requires a petitioner to show "actual innocence." *Id.* ¶ 23.

¶ 62 The General Assembly codified the "cause-and-prejudice" exception in section 122-1(f) of the Act, which provides that leave of court to file a successive petition may be granted "only if the petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2018). The Act instructs that a defendant "show cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." *Id.* A defendant "shows prejudice by demonstrating that the claim not raised during his or her post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 63 To meet the cause-and-prejudice test, a defendant is required to "'submit enough in the way of documentation to allow a circuit court to make that determination.' [Citation.]" *People v. Smith*, 2014 IL 115946, ¶ 35. "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petition fail as a matter of law or where the

successive petition with supporting documentation is insufficient to justify further proceedings. [Citations]" *Id*. "The legislature intended for the courts to make cause-and-prejudice determinations on the pleadings and not by evidentiary hearings." *People v. Clark*, 2023 IL 127273, ¶ 47 (citing *Smith*, 2014 IL 115946, ¶ 33).

¶ 64    When a defendant moves for leave to file a successive petition, the circuit court "must decide the legal question of whether a defendant has satisfied the section 122-1(f) requirement of showing cause and prejudice" which is "a preliminary screening to determine whether defendant's *pro se* motion * * * adequately alleges facts demonstrating cause and prejudice. [Citation.]" *People v. Bailey*, 2017 IL 121450, ¶ 24. If a defendant has "made a *prima facie* showing of cause and prejudice," leave to file the petition should be granted. *Id*. Thus, at this early leave-to-file stage, the petition does not have to make the "substantial showing" that will later be required at the second-stage hearing after counsel is appointed. *People v. Robinson*, 2020 IL 123849, ¶ 58. Satisfying the cause and prejudice test does not entitle a defendant to relief, but rather "only gives a petitioner an avenue for filing a successive postconviction petition." *Id*. (quoting *People v. Smith*, 2014 IL 115946, ¶ 29). Denial of leave to file is reviewed *de novo*. *Bailey*, 2017 IL 121450, ¶ 13.

¶ 65                                   A. Waiver and *Res Judicata*

¶ 66    As a threshold matter, we first address the issue of the applicability of the preclusion doctrines of *res judicata* and waiver. Defendant, in his recitation of the facts in this case, alleged that his initial postconviction petition included an allegation: "his statement should have been suppressed because it was false and involuntarily made…" In defendant's argument section, in which he asserts that he could establish the "cause" element, he does not specifically address whether this claim was contained in his initial petition. Instead, he asserts that the evidence that he attached to

his sixth successive postconviction petition was unavailable at the time of trial and when he filed his initial petition.

¶ 67      However, a review of the record shows that defendant did not raise this issue in his initial postconviction petition. Therefore, we find that defendant waived review of this issue by failing to include it in his postconviction petition. 725 ILCS 5/122-3 (West 2018) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.")

¶ 68      B. Police Coercion

¶ 69      We now consider whether defendant can satisfy the cause and prejudice test for his claim that Detective Halloran coerced him into providing his statements, which he raised for the first time in his sixth successive postconviction petition. Because we find that defendant did not establish the prejudice prong, we need not address defendant's contention that he was able to establish cause for his failure to raise this issue on direct appeal or in his earlier postconviction proceedings. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 32 ("[B]oth prongs must be met before leave to file a successive petition will be granted."). Thus, we may uphold the denial of leave to file the claim if defendant has failed to establish either prong. *People v. Davis*, 2014 IL 115595, ¶ 56.

¶ 70      Defendant argues that evidence that Detective Halloran had engaged in coercive conduct similar to that alleged in the documentation contained in the TIRC report would have changed the outcome of the trial. See *People v. Harris*, 2021 IL App (1st) 182172, ¶ 50 ("…the sole issue before the circuit court was whether the outcome of defendant's suppression hearing would have been different if the officers who denied using physical coercion had been subject to impeachment based on defendant's evidence showing a pattern and practice of police abuse."). In turn, the State relies upon our supreme court's decision in *People v. Blalock*, 2022 IL 126682, and argues that

defendant did not show prejudice because his abuse allegations did not align with his allegations of abuse raised in his pre-trial motion to suppress. We agree with the State's argument and find that *Blalock* controls.

¶ 71    "Prejudice" for purposes of a motion for leave to file a successive postconviction petition is defined similarly to the "prejudice" required to support a claim of ineffective assistance of counsel. *People v. Pitsonbarger*, 205 Ill.2d 444, 464 (2002). For instance, in *Pitsonbarger*, our supreme court adopted the *Strickland* standard of prejudice for successive postconviction petitions, which was first articulated in *People v. Flores*, 153 Ill.2d 264, 280 1992) ("Whether the seemingly narrower test of prejudice required in a *Strickland* analysis satisfies the requisite showing of prejudice under *McCleskey* is uncertain"), and reaffirmed that adoption in *People v. Smith*, 2014 IL 115946, ¶ 34 ("We analogized the cause-and-prejudice test in the context of a successive postconviction petition to the cause-and-prejudice test for ineffective assistance of counsel articulated in *Strickland*." (citing *Pitsonbarger*, 205 Ill.2d at 464.)). Applying that standard in this context, "the question is not whether a court can be certain [the error] had no effect on the outcome or whether it is possible a reasonable doubt might have been established [absent the error.]" *People v. Lewis*, 2022 IL 126705, ¶ 46 (quoting *People v. Johnson*, 2021 IL 126291, ¶ 54).

> Instead, [the court] asks whether it is 'reasonably likely' the result would have been different. *Strickland*, 466 U.S. at 696. A defendant must show that there is a reasonable probability that, but for [the error] the result of the proceeding would have been different. [Citation.] A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]

*Lewis*, 2022 IL 126705, ¶ 46.

¶ 72    In *Blalock*, our supreme court considered whether the defendant established prejudice in the context of a claim of police coercion. In that case, the defendant filed a second successive postconviction petition in which he alleged that he had newly discovered evidence that the police

detectives who interrogated him, Detectives Halloran and O'Brien and Murray, had engaged in a pattern and practice of police brutality and that his resulting confession was the product of police coercion. In determining whether the defendant established prejudice in his successive postconviction petition, our supreme court recognized that, while "all-well pleaded allegations in the petition and supporting affidavits are taken to be true," (*People v. Robinson*, 2020 IL 123849, ¶ 45), the dismissal of a petition is upheld where "the allegations are contradicted by the record from the original trial proceedings." (*People v. Torres*, 228 Ill.2d 382, 394 (2008). *Blalock*, 2022 IL 126682, ¶ 48. In doing so, our supreme court also recognized its previous holding in *People v. Smith*, 2014 IL 115946, ¶ 35, that "'leave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings.'" *Id*. ¶ 48.

¶ 73    The supreme court compared the defendant's testimony at trial to the allegations contained in his postconviction petition. *Id*. ¶ 49. The court looked at the defendant's testimony at trial that he fabricated his statement because he wanted to appease the detectives and assistant state's attorney because they would not accept his version of events, and not because anyone threatened him to make his statement. However, the defendant alleged in his postconviction petition that he was choked until he passed out, urinated on himself, and had his pinky nail split open and a gun put to his head during the interrogation. After detailing the distinction between the two claims, our supreme court held, "[b]ecause defendant's allegations of police coercion are directly contradicted by his sworn trial testimony, defendant failed to make a showing of prejudice, and the appellate

court correctly affirmed the circuit court's judgment denying leave to file the second successive petition." *Id.*

¶ 74    Here, defendant did not testify at the hearing on his motion to suppress or at trial. During the hearing on the motion to suppress, upon questioning from the trial court, defendant stated that he did not wish to testify on his own behalf. Before the hearing commenced, he was sworn to accuracy of the facts contained in his motion by the trial court. In his motion, he alleged that his statements were obtained by "physical coercion illegally directed against the defendant" including: (1) he was deprived of food and sleep for two days; (2) he was verbally threatened repeatedly by various detectives; (3) he was thrown to the ground at his place of employment; and (4) a "short white" detective threw him against the wall, injuring his thumb, and punched him in the chest and stomach several times. He did not specifically identify in his motion what conduct was allegedly committed by Detective Halloran. In sharp contrast, defendant alleged in his postconviction petition that Detective Halloran "viciously and repeatedly choked and threatened to continue to doing physical harm to him…" Defendant's allegations in his postconviction petition contradict the allegations he swore to during the hearing on his motion. Consequently, following *Blalock*, we find that defendant failed to make a showing of prejudice, and the circuit court's decision to deny defendant leave to file his sixth successive petition should be affirmed.

¶ 75    Defendant argues that his petition is not contradicted by the trial record because the defendant in *Blalock* relied upon trial testimony, and, here, the evidence was the contents of defendant's motion, which he was sworn to prior to the start of the hearing. In other words, defendant suggests that when the evidence is in the form of the contents of the defendant's motion, which defendant is sworn to, as opposed to sworn testimony, it does not provide grounds for us to find that his petition was directly contradicted by the trial record. Obviously, the trial record consists of several

different forms of proof, including trial testimony as well as written documentation. He does not provide us with any caselaw suggesting that a court cannot consider evidence from the contents of a motion filed by the defendant and sworn to by defendant, as opposed to trial testimony.

¶ 76    Defendant further relies upon our supreme court's discussion in *People v. Robinson*, 2020 IL 123849, regarding what constitutes evidence that is "positively rebutted" by the record. Defendant argues that, in *Robinson*, our supreme court "distinguished post-conviction claims that contradict the trial record from those that are 'positively rebutted' by the record." He cites to the language in *Robinson* court that a postconviction claim is positively rebutted by the record only if it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and uncontestably demonstrated to be false or impossible…" *Id.* ¶ 60. In doing so, he suggests that in this case,"[a]t most, there are contradictions between the trial record and the claims in the petition, which should be resolved at an evidentiary hearing."

¶ 77    However, the difference between *Robinson* and the facts of this case revolves around what kind of trial evidence is being considered. In *Robinson*, our supreme court considered whether the contents of the supporting affidavits of newly discovered witnesses contradicted with the evidence presented by the prosecution witnesses at defendant's trial. *Id.* ¶ 57. Here, in sharp contrast, we are comparing the defendant's own allegations in his pre-trial motion seeking to suppress his handwritten statements to defendant's own allegations in his postconviction petition. Notably, our supreme court made a similar comparison in *Blalock* when it compared defendant's prior trial testimony with the allegations in his postconviction petition. *Blalock*, 2022 IL 126682 ¶ 49.

¶ 78    We are aware of the TIRC findings against Detective Halloran and are troubled by his involvement in this case, but defendant has significantly changed his version of abuse. As a result, we cannot conclude on this record that he has established prejudice. Thus, because defendant's

allegations of police coercion are directly contradicted by the trial record, defendant failed to make a showing of prejudice, and we affirm the circuit court's judgment denying him leave to file his sixth successive postconviction petition.

¶ 79                    C. Ineffective Assistance of Trial Counsel

¶ 80        Defendant contends that the circuit court erred in denying him leave to file his sixth successive postconviction petition where he established cause and prejudice for his claim that his trial counsel was ineffective for not investigating and supporting the claim that defendant's statements were coerced with evidence that Detective Halloran had been involved in the systemic abuse of suspects. In turn, the State argues that the circuit court properly denied him leave to file his claim of ineffective assistance of trial counsel because defendant could not establish cause and prejudice. Again, because we find that defendant cannot establish prejudice, we do not need to address whether he established cause. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 32 ("[B]oth prongs must be met before leave to file a successive petition will be granted.").

¶ 81        In particular, the arguments by both parties, in part, relate to whether this type of evidence was available to defense counsel at the time that this case was pending at the trial level. The hearing on defendant's motion to suppress was held in March of 2000, and his trial commenced in August of 2002. Relying upon an article discussed in *People v. Peoples*, 2020 IL App (1st) 161068-U, defendant contends that his defense counsel should have supported his motion to suppress with allegations against Detective Halloran because "by the late 1970's to early 1980's, torture by Chicago police officers was common knowledge in Cook County Criminal Courts." The State argues that the courts have already determined that it is not unreasonable for trial counsel to fail to investigate claims of police coercion in other cases and to present this testimony at trial.

¶ 82     The United States Constitution guarantees criminal defendants the right to effective assistance counsel. Thus, where a criminal defendant is convicted of an offense but did not receive constitutionally adequate representation, he can seek relief to vindicate his constitutional right to counsel. *People v. Burnett*, 385 Ill.App.3d 610, 614 (1st Dist. 2008). Under the *Strickland* standard, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 11746, ¶ 23 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Specifically, the defendant must demonstrate "that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 36. When reviewing a ruling on a motion to suppress, overcoming *Strickland's* prejudice prong requires the defendant to show a reasonable probability that: (1) the suppression motion would have been granted; and (2) the trial outcome would have been different if the evidence had been suppressed." *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *People v. Bew*, 228 Ill.2d 122, 128-29 (2008)). Both elements of the *Strickland* test must be met, and we may analyze them in any order. *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 109.

¶ 83     Generally, the decision about what evidence to present is a strategic one. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. But "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill.App.3d 70, 79 (1st Dist. 2002). To this end, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. And "strategic decisions may be made only after there has been a 'thorough investigation of law

and facts relevant to plausible options.'" *People v. Gibson*, 244 Ill.App.3d 700, 703-04 (4th Dist. 1993) (quoting *Strickland*, 466 U.S. at 690). Allegations of prior misconduct by a police officer may be admissible at trial "to prove intent, plan, motive or a course of conduct of the officer [citations] or to impeach an officer as a witness based on bias, interest, or motive to testify falsely." *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 11. Whether trial counsel was ineffective for failing to investigate is generally determined by comparing the strength of the trial evidence with the value of the evidence allegedly not presented at trial. *People v. Clark*, 2011 IL App (2d) 100188, ¶ 24.

¶ 84 Initially, we note that there is no evidence that trial counsel failed to investigate the backgrounds of the officers as to whether they had previous complaints against them for coercive tactics. Assuming *arguendo* that counsel did unreasonably fail to do so, this failure did not prejudice defendant. In resolving this issue, we look to cases in which the courts have previously addressed the availability of evidence, relating to coercive tactics by police detectives. Consistently, Illinois courts have found that a trial counsel's failure to investigate and present evidence of police misconduct in other cases did not constitute ineffective assistance of counsel. For instance, in *People v. Orange*, 168 Ill.2d 138, 149 (1995), our supreme court held that the defendant could not establish his claim of ineffective assistance of counsel for failing to investigate a claim of police misconduct where "[c]ounsel has only a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary…"

¶ 85 Subsequently, in *People v. Deloney*, 341 Ill.App.3d 621, 636 (1st Dist. 2003), the court found that the defendant could not establish prejudice when his trial counsel failed to present evidence of police abuse. In doing so, the court held:

> Even if the evidence [of police abuse] was available at the time of trial, and counsel had failed to discover it, we do not believe that counsel's failure to investigate defendant's

> claim of police misconduct failed to meet reasonable professional standards. We accord a heavy measure of deference to counsel's decision regarding whether to investigate the allegations of abuse.

*Deloney*, 341 Ill.App.3d at 636 (citing *Orange*, 168 Ill.2d at 149); see also *People v. Anderson*, 375 Ill.App.3d 121 (1st Dist. 2007) (trial counsel was not ineffective for failing to investigate claims of police misconduct at Area 2).

¶ 86    The State specifically relies on *People v. Tyler*, 2015 IL App (1st) 123470, in which the defendant alleged his trial counsel was ineffective for failing to corroborate his claim of police misconduct with evidence that the same detective had engaged in a pattern of abusing defendants into giving confessions. In responding to the prosecution's argument that the defendant's claim was barred by *res judicata* because the defendant had not established that this evidence was "newly discovered," the court held, "[g]iven the sensitive nature of police investigations and the sheer scale of the criminal justice system, it is unreasonable to expect defense counsel to discover whom these individual detectives were abusing unless counsel interviewed every suspect who was detained by them." *Tyler*, 2015 IL App (1st) 123470, ¶ 162 (citing *People v. Patterson*, 192 Ill.2d 93, 109 (2000) ("beyond interviewing anyone who had ever been a prisoner at Area 2, we can conceive of no manner in which [defense counsel] reasonably could have obtained this information."); *People v. Reyes*, 369 Ill.App.3d 1, 20 (1st Dist. 2006) ("the various allegations against [the detective] could have been discovered prior to trial only if defense counsel had interviewed every person ever detained by [the detective]." More recently, in *People v. Plummer*, 2021 IL App (1st) 200299, ¶ 96, the court followed this line of cases when determining that the TIRC reports for the detective were not discoverable by defense counsel at the time of the defendant's trial. Thus, in all of these cases, the courts acknowledged the difficulty faced by

defense counsel in securing evidence of police misconduct in other cases and found this type of evidence to be newly discovered for purposes of relaxing the doctrine of *res judicata*.

¶ 87    While, in these cases, the issue of whether the defense counsel could have discovered this information at the time of trial was considered in the context of determining the applicability of *res judicata*, we find that this determination provides guidance for us in determining whether trial counsel is ineffective. Moreover, defendant distinguishes *Tyler* on the grounds that it was decided at the second stage of postconviction proceedings in which the defendant has a higher burden of making a substantial showing. We acknowledge this distinction but recognize that we should deny leave to file a successive postconviction where "it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petition fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings. [Citations]" *People v. Smith*, 2014 IL 115946, ¶ 35. Here, from the documentation submitted by defendant, and the pertinent caselaw, it is clear that defendant's claim falls as a matter of law. Trial counsel's failure to investigate and present evidence of police misconduct in other cases did not constitute ineffective assistance of counsel did not fall below an objective standard of reasonableness. As a result, we find that defendant cannot establish that his trial counsel was ineffective for failing to investigate and corroborate his claim of police coercion and abuse where courts have previously determined that it is unreasonable to expect defense counsel to discover whom these individual detectives were abusing in other cases in order to present that evidence at trial.

¶ 88                                 CONCLUSION

¶ 89    For the aforementioned reasons, we affirm the circuit court's decision to deny defendant leave to file his sixth successive postconviction petition.

¶ 90    Affirmed.