2024 IL App (1st) 221438-U

No. 1-22-1438

Order filed November 21, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 13032 |
| | ) | |
| JOSE SALGADO, | ) | Honorable |
| | ) | Marc W. Martin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE OCASIO delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's third-stage postconviction order as defendant received a reasonable level of assistance from postconviction counsel. We also affirm the court's second-stage postconviction order as defendant cannot show plea counsel provided ineffective assistance for failing to file a timely motion to withdraw defendant's guilty plea.

¶ 2    Defendant Jose Salgado appeals from the circuit court's orders dismissing one of his claims under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) at the second stage and denying the remainder of his petition following a third-stage evidentiary hearing. He

argues that his postconviction counsel did not provide a reasonable level of assistance during third-stage proceedings and that the court erred in dismissing his claim of ineffective assistance of plea counsel at the second stage. For the following reasons, we affirm.

¶ 3       Salgado was charged with six counts of first degree murder for shooting and killing Divina Salgado while armed with a firearm.[1] On September 7, 2017, through a Spanish interpreter, Salgado entered a negotiated guilty plea to one count of first degree murder in exchange for 38 years' imprisonment and the State striking the language of the indictment indicating that he shot Divina and was armed with a firearm. He was represented by assistant public defender (APD) Caroline Glennon.

¶ 4       Upon questioning by the court, Salgado confirmed that he wished to accept the State's offer and plead guilty. The court admonished him about the nature of the charge, various trial-related rights, the possible penalties, and the consequences of conviction. Salgado indicated he understood the admonishments and had no questions. The court stated it was holding up a jury waiver document, and Salgado stated he could "see it well" and agreed he had signed it. Salgado denied that anybody had threatened or forced him to plead guilty. He was pleading guilty of his own free will and it was his decision alone. He had had enough time to discuss the plea with Glennon, who had also explained that he would have to serve 100% of the sentence. He was satisfied with Glennon's services.

¶ 5       The State proffered that its evidence would show that, on July 31, 2016, Salgado killed Divina, his wife, in front of their 15-year-old child and while she held their 1-year-old child, and confessed to their 18-year-old child, a neighbor, and the police. Salgado confirmed the factual

_____

[1] As Divina's surname is the same as the defendant's, we refer to her using her first name.

basis was accurate. The court found that Salgado was knowingly and voluntarily waiving his constitutional rights, and it accepted his plea. Salgado confirmed he wished to waive his right to a presentence report and agreed he had signed a paper the court was holding. The court sentenced Salgado to 38 years' imprisonment.

¶ 6 On November 19, 2017, more than two months after pleading guilty, Salgado placed a *pro se* petition to withdraw his guilty plea in the institutional mail system at Menard Correctional Center, addressed to the clerk of the circuit court. He alleged that, when he pleaded guilty, he had not been in a clear state of mind due to "heavy medication" and could not make a rational decision about pleading. After entering his guilty plea, he had no access to writing materials for about two weeks. On September 26, 2017, he wrote Glennon and asked her to file a motion to withdraw his plea. She did not respond but, at an unspecified time, acknowledged receiving the letter. On October 23, 2017, he wrote her again with the same request. He spoke with Glennon by phone on November 16, 2017. She explained how to move to withdraw a guilty plea and that it had been more than 30 days since he entered the plea. Salgado argued that Glennon's failure to file a timely motion to withdraw his plea should not be attributed to him.

¶ 7 Salgado attached an affidavit, certified under penalty of perjury pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2016)) attesting to his allegations and a letter to Glennon dated October 23, 2017, stating he made an unreasonable decision to plead guilty due to his medication and never wanted to waive his constitutional rights.

¶ 8 APD Camille Calabrese was appointed to represent Salgado. On February 8, 2018, the court recharacterized Salgado's pleading as a petition for relief under the Act and allowed him to withdraw the pleading or amend it.

¶ 9     On March 28, 2018, Salgado filed a *pro se* petition for relief under the Act claiming that Glennon was ineffective for failing to file a timely motion to withdraw his plea. He alleged that, in addition to writing Glennon on September 26, 2017, he had written his uncle, Hermenegildo Salgado, and asked him to call Glennon about his request to withdraw his plea.[2] Salgado's cousin Dora Rodriguez then spoke with Glennon, who stated that Salgado should write the court asking to withdraw his plea. When Salgado and Glennon spoke on November 16, 2017, she acknowledged receiving his September 26, 2017, letter but noted it did not contain a legal justification for withdrawing his plea, a concept he did not understand until speaking with a "jail house lawyer" and law library staff.

¶ 10     Salgado attached affidavits from Hermenegildo and Rodriguez. Hermenegildo averred that he received a letter from Salgado around October 2, 2017, and asked Rodriguez to contact Salgado's lawyer about appealing his case. Rodriguez averred that she left Glennon voicemails on October 6 and October 9, 2017. She spoke with Glennon on October 16, 2017. She told Glennon about Salgado's letter and that Salgado wanted to appeal but Rodriguez did not know why. Glennon stated she would contact Salgado.

¶ 11     Salgado further alleged that the prison had deprived him of mail from Calabrese and he had filed a grievance upon learning she had sent him a letter he did not receive. Salgado attached another certified affidavit stating that the notary at his prison had refused his requests to notarize documents.

¶ 12     On May 25, 2018, the court docketed Salgado's petition for second stage proceedings under the Act.

---

[2] We will refer to Hermenegildo by his first name as he shares a surname with the defendant.

¶ 13    At a hearing on August 31, 2018, another APD appearing on Calabrese's behalf stated Calabrese had prepared an amended petition "with the caveat that [Calabrese was] missing an exhibit in the pleadings and she need[ed] an affidavit from" Salgado. The court allowed Calabrese's amended petition to be filed.

¶ 14    In the amended petition, Calabrese incorporated Salgado's *pro se* postconviction petition and motion to withdraw his guilty plea. The amended petition claimed that Glennon should have filed a motion to withdraw Salgado's plea after receiving Rodriguez's October 6, 2017, voicemail, knowing that Salgado could not communicate in English and that his time to move to withdraw his plea would soon expire. Glennon could later have amended or withdrawn the motion if appropriate. The amended petition further claimed that Salgado's plea was involuntary as he was confused from the medications he had been prescribed and, due to his language barrier, did not understand the legal meaning of "voluntariness."

¶ 15    Calabrese attached a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) stating that she had consulted with Salgado to ascertain his contentions regarding the deprivation of his constitutional rights, examined the record, and made any amendments to his *pro se* petition necessary to adequately present his contentions.

¶ 16    On October 4, 2018, Calabrese filed another amended postconviction petition repeating the same claims. In addition to the exhibits Salgado had previously submitted, Calabrese attached a prison grievance that he filed on February 26, 2018, alleging his mail was being tampered with as he had not received mail from Calabrese and that Glennon never received his "Sep 26" letter.

¶ 17    The State filed a motion to dismiss Salgado's petition. The State argued that Salgado had not shown on what date Glennon received his September 26, 2017, letter or Rodriguez's October

6, 2017, voicemail. Further, he was not prejudiced by any allegedly deficient performance by Glennon as the court would not have granted his motion to withdraw.

¶ 18    A half-sheet dated January 17, 2020, provides that on that date, the court heard argument and granted the State's motion as to Salgado's ineffective assistance claim but denied it as to Salgado's involuntary plea claim and would hold a third-stage hearing thereon. The record on appeal does not include a transcript of the hearing, and a court reporter has certified that the stenographic notes from that date are illegible. On a later date, the court stated it had ruled that Glennon had not performed deficiently as she had only heard from Salgado's family, not Salgado himself, before his time to file a motion to withdraw his plea expired.

¶ 19    On February 18, 2022, Calabrese stated that she did not anticipate calling any witnesses at the third-stage hearing besides Salgado and that he "wasn't seen by a doctor at the time," so she did not have "a doctor's report as to his state of mind at the time that he pled."

¶ 20    On September 23, 2022, the court held the third-stage evidentiary hearing. Calabrese entered a stipulation to records showing the medications Salgado had been prescribed when he pleaded guilty, and that a Physician's Desk Reference Manual (PDR) accurately listed the possible side effects of the medications.

¶ 21    The exhibits are included in the record on appeal and have been reviewed by this court. They reflect that, on September 7, 2017, the day Salgado pleaded guilty, he was prescribed mirtazapine and hydroxyzine.[3] He had also been prescribed other medications at various dosages between August 2016 and July 2017. The PDR indicates that side effects for hydroxyzine include

---

[3] Calabrese also argued at the hearing that defendant was prescribed sertraline on the date he pleaded guilty. An exhibit shows that, although the prescription was supposed to last through the date of the hearing, it was discontinued on July 24, 2017.

impaired cognition, confusion, psychosis, and hallucinations, and for mirtazapine include confusion, delirium, mania, hallucinations, and depression.

¶ 22 Salgado testified that his medications made him "[s]leepy." He spoke with Glennon through an interpreter on the day he pleaded guilty but Glennon did not ask how he felt, if he had taken his medication, or if his medications had changed. He did not tell her he felt unwell. She said many things about his plea that he did not understand. She told him to "sign," and she did not indicate he could have more time to think. Salgado did not remember speaking with the court very well due to his medications but "vaguely" remembered saying that he was voluntarily pleading. He did so because he "had already signed the paper" and did not know he had time to think about whether it was a good plea offer. He had not wanted to accept the offer.

¶ 23 On cross-examination, Salgado agreed that he killed Divina by shooting her in front of their 15-year-old while she held their 1-year-old. He had started taking antianxiety medication and another medication a month or two after arriving in jail. He experienced side effects but never told Glennon he did not understand their conversations or what was happening. He had understood that, prior to September 7, 2017, the minimum penalty he faced was 45 years and that the State withdrew the allegation that he killed his wife with a firearm when he pleaded guilty.

¶ 24 On the day Salgado pleaded guilty, Glennon never indicated they could get another court date for him to think about the offer. She put a paper in front of him and said they would give him 38 years' imprisonment. He never told the court interpreter that he did not understand what was happening or that his medication made him sleepy. After he wrote Glennon, they spoke on the phone and he did not tell her that he had not understood the guilty plea proceedings. Upon

questioning from the court, Salgado testified that Glennon visited him in jail four or five times before he pleaded guilty.

¶ 25    The State called Glennon, who testified that she never doubted during visits at the jail that Salgado understood what was being communicated to him through the interpreter. Salgado authorized her to negotiate a plea agreement. They had multiple conversations about plea offers and he never indicated he did not understand because he was taking medication. On September 7, 2017, he indicated that he wanted to accept the offer. He signed a jury waiver and presentence investigation waiver. Glennon explained what would happen during the plea proceeding, including that the judge would ask if he was pleading guilty voluntarily. He did not ask about the meaning of the word voluntary. He did nothing to indicate he did not understand what was happening.

¶ 26    Following Salgado's plea, Glennon heard from a family member of Salgado's that he wanted to withdraw his plea. Glennon arranged a phone call with Salgado, during which he said he was unhappy with his sentence and wanted a trial. Salgado did not say that his medication had prevented him from understanding the plea proceeding. Glennon explained he needed a legal reason to withdraw his plea, not just "buyer's remorse" or changing his mind. He indicated that "38 years was too much time," and he did not think his children would testify against him. He then indicated "that he was taking medication and that he was too upset, too angry, about the sentence and that he wanted to withdraw it."

¶ 27    On cross-examination, Glennon testified that she did not know what medications Salgado was taking. She did not ask him on the day he pleaded guilty how he was feeling.

¶ 28    On redirect examination, Glennon testified that when she doubted a client's ability to understand things due to medication, she would request behavioral clinical examinations. On

questioning by the court, Glennon testified that when she received the plea offer to which Salgado ultimately agreed, she went to the jail and discussed it with him. It appeared that he understood the offer.

¶ 29    Marta Meza testified that she had been an interpreter for the public defender's office and accompanied Glennon to speak with Salgado in jail and at court. Salgado never indicated that he did not understand what she was interpreting. On the day he pleaded guilty, he did not seem sleepy or inattentive or indicate he did not understand the offer or what was happening. After Salgado pleaded guilty, Meza interpreted during a phone call between him and Glennon in which he indicated he was unhappy with his sentence but not that he had been medicated or did not understand the plea proceedings.

¶ 30    The court interpreter from Salgado's plea hearing testified that she did not recall the case but that every time a person for whom she was interpreting stated that he or she did not understand something, she repeated that out loud.

¶ 31    During argument, Calabrese contended that Salgado's descriptions of how his medications made him feel corresponded with their possible side effects, such as impaired cognition.

¶ 32    Following argument, the court denied Salgado's petition. It stated it had presided over Salgado's plea proceedings and recalled the case. During the plea admonishments, Salgado stood at a podium. He never asked to sit or for a break because he was tired, and he had no questions about the admonishments. The court never detected that Salgado was confused. The plea offer had been conveyed to Salgado before the day he pleaded guilty, and he indicated at the plea hearing that he had had enough time to discuss the plea with Glennon. After pleading guilty, he first told Glennon that he wanted to withdraw his plea because he was upset with his sentence. Further,

"[n]o medical testimony was presented particular to" Salgado. The court found credible Glennon's testimony that if she doubted his fitness, she would have requested that he be examined, and it noted that defendants taking psychotropic medications were not presumed to be unfit.

¶ 33    On appeal, Salgado argues that Calabrese failed to provide a reasonable level of assistance at the third-stage evidentiary hearing by failing to call an expert witness to testify to the effects of his medications and that the court erred in dismissing, at the second stage, his claim that Glennon was ineffective for failing to file a motion to withdraw his guilty plea.[4]

¶ 34    The Act provides a three-stage process for a defendant to allege his conviction resulted from a substantial denial of his constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2016); *People v. Huff*, 2024 IL 128492, ¶ 19. At the first stage, the court independently assesses the petition and determines whether it is frivolous or patently without merit. *Huff*, 2024 IL 128492, ¶ 19; see also 725 ILCS 5/122-2.1 (West 2016). If not, the court advances it to the second stage. *Huff*, 2024 IL 128492, ¶ 19. At the second stage, the State may move to dismiss the petition, and the court determines whether the petition and accompanying documentation make a substantial showing of a constitutional violation. *People v. Roland*, 2023 IL 128366, ¶ 25. If the defendant makes a substantial showing, the court holds a third-stage evidentiary hearing where it serves as factfinder and makes credibility determinations. *People v. Plummer*, 2021 IL App (1st) 200299, ¶ 71. At the hearing, the defendant bears the burden of showing a denial of a constitutional right by the preponderance of the evidence. *Id.*

---

[4] We have jurisdiction to review the court's second-stage order as it was a step in the procedural progression leading to the final judgment, the court's third-stage order which resolved all of defendant's claims. See *People v. Garcia*, 2015 IL App (1st) 131180, ¶¶ 3, 66-69.

¶ 35    There is no constitutional right to counsel in proceedings under the Act. *People v. Urzua*, 2023 IL 127789, ¶ 51. However, the Act provides for the appointment of counsel to an indigent defendant whose petition survives the first stage. 725 ILCS 5/122-4 (West 2016). Defendants are entitled only to a "reasonable level" of assistance in proceedings under the Act. *Urzua*, 2023 IL 127789, ¶ 51.

¶ 36    At the second stage, counsel's duties are set out by Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), which provides that counsel must consult with the defendant to ascertain his contentions, review the record, and make any amendments to the defendant's *pro se* petition that are necessary to adequately present his contentions. *Urzua*, 2023 IL 127789, ¶ 54. If counsel certifies compliance with those duties, there is a rebuttable presumption that counsel provided reasonable assistance. *Id.*

¶ 37    At the third stage, Rule 651(c) does not govern, and the standard is "general reasonableness." (Internal quotation marks omitted.) *People v. Knight*, 2020 IL App (1st) 170550, ¶¶ 38-39. The general reasonableness standard does not require that a defendant receive the level of assistance mandated by *Strickland v. Washington*, 466 U.S. 668 (1984), but *Strickland* nevertheless provides "an essential standard for comparison" when evaluating counsel's level of performance at the third stage. (Internal quotation marks omitted.) *People v. Coons*, 2024 IL App (4th) 230552, ¶ 41. Thus, when considering whether a defendant received an unreasonable level of assistance during the third stage, courts have considered whether postconviction counsel's performance could be deemed constitutionally ineffective under *Strickland*. See *People v. Pabello*, 2019 IL App (2d) 170867, ¶¶ 36-37; *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 37. If

counsel's performance meets the *Strickland* standard, it necessarily meets the lower reasonableness standard. *Coons*, 2024 IL App (4th) 230552, ¶ 41.

¶ 38    Our review is *de novo*. See *id.* ¶¶ 33-34 (reviewing *de novo* a claim of unreasonable assistance of counsel at the third stage as the issue was not addressed below).

¶ 39    Under *Strickland*, the defendant must establish that (1) "his attorney's representation fell below an objective standard of reasonableness" and (2) "a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *People v. Torres*, 2024 IL 129289, ¶ 27. We conclude that Salgado has not shown that Calabrese provided ineffective assistance under *Strickland* and therefore has not shown that she failed to provide a reasonable level of assistance.

¶ 40    Initially, Salgado notes that, during second stage proceedings, Calabrese filed a Rule 651(c) certificate. However, another APD stated on August 31, 2018, that Calabrese still needed to provide an affidavit from Salgado. Calabrese then filed an amended postconviction petition on October 4, 2018, without attaching any new affidavit or Rule 651(c) certificate. Salgado argues this contradicts her certification that she made all necessary amendments to the petition. He also argues that Calabrese should have objected during the evidentiary hearing when the prosecutor asked Salgado about the facts of the offense.

¶ 41    However, Salgado solely asserts that these alleged errors show "to a lesser degree, that [Calabrese] acted unreasonably throughout the proceedings which culminated when [she] failed to investigate into or hire an expert witness to support [his] claim." He does not argue that they require remand for further postconviction proceedings. We will therefore focus, as does Salgado, on whether Calabrese provided an unreasonable level of assistance at the third stage by not

investigating or presenting an expert medical witness. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited.").

¶ 42 Salgado claims that Calabrese could not have proven his claim without an expert medical witness. He notes that a defendant is not presumed to be unfit merely because he is taking psychotropic medications (725 ILCS 5/104-21(a) (West 2016)), expert testimony is allowed where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" (Ill. R. Evid. 702 (eff. Jan. 1, 2011)), and the circuit court noted the lack of medical testimony in denying Salgado's petition.

¶ 43 We reject Salgado's claim because he has not identified an expert witness whom Calabrese should have called. He argues there is no evidence that Calabrese attempted to identify one, but she stated on February 18, 2022, that Salgado had not been seen by a doctor around the time he pleaded guilty, indicating she had investigated whether there was a doctor who could opine as to Salgado's mental state at that time. Moreover, Calabrese did not argue that Salgado was unfit merely because he was taking psychotropic medications. She introduced evidence of the possible side effects of his medications, examined him about how the medications made him feel, and then argued that his testimony comported with the potential side effects. Rule 702, which allows expert testimony where it would be helpful, does not require counsel to present expert testimony. Ill. R. Evid. 702 (eff. Jan. 1, 2011). Thus, Calabrese's performance did not fall below an objective standard of reasonableness.

¶ 44 Further, in its ruling, the circuit court stated that it had observed Salgado on the day he pleaded guilty and did not believe him to have been negatively impacted by any medication. Salgado testified he merely felt "[s]leepy" and wanted more time to consider the plea offer.

Glennon never doubted Salgado's ability to understand the plea offer or the in-court proceedings, and she had alerted him to the plea offer before the day he pleaded guilty. Meza never believed that Salgado had trouble understanding conversations with Glennon.

¶ 45    As Salgado has not identified an expert witness whose testimony would have rebutted the observations of Glennon, Meza, and the court about Salgado's mental state on the day he pleaded guilty, his claim that he was prejudiced by Calabrese's failure to call an expert witness is speculative, which is insufficient to establish prejudice. *People v. Johnson*, 2021 IL 126291, ¶ 58 (prejudice cannot be based on conjecture or speculation, and "speculation as to what an expert witness would say is insufficient to establish prejudice" (citing *Wildman v. Johnson*, 261 F. 3d 832, 839 (9th Cir. 2001)); see also *Coons*, 2024 IL App (4th) 230552, ¶¶ 45, 53 (defendant could not establish prejudice by postconviction counsel's failure to present evidence where record did not establish the evidence existed or was available to counsel).

¶ 46    Thus, Salgado has failed to establish that Calabrese provided ineffective assistance under *Strickland*, and therefore has not shown that she failed to provide a reasonable level of assistance under the Act. *Coons*, 2024 IL App (4th) 230552, ¶ 41. Accordingly, we affirm the court's third-stage order.

¶ 47    Salgado also contends that the circuit court erred in dismissing his ineffective assistance claim at the second stage. He argues he made a substantial showing that Glennon provided ineffective assistance by failing to file a timely motion to withdraw his guilty plea, which resulted in his forfeiting his right to appeal.

¶ 48    A substantial showing means that the factual allegations, if proven at an evidentiary hearing, would entitle the defendant to relief. *People v. Dupree*, 2018 IL 122307, ¶ 29. The

defendant's allegations are taken as true at the second stage unless they are positively rebutted by the record. *Id.* We review second-stage dismissals *de novo*. *Id.* Although the circuit court found that Salgado failed to establish that Glennon performed deficiently, under the *de novo* standard we review the circuit court's judgment, not the reasons for its judgment, and may affirm on any basis in the record. *Beck v. DayOne Pact*, 2023 IL App (1st) 221120, ¶ 29; *Phoenix Capital, LLC v. Nsiah*, 2022 IL App (1st) 220067, ¶ 20.

¶ 49    As for the *Strickland* deficiency prong, Salgado argues that Glennon should have filed a motion to withdraw his guilty plea after receiving his September 26, 2017, letter and his cousin's October 6, 2017, voicemail. Without filing a motion to withdraw his plea within 30 days, Salgado could not appeal. Ill. S. Ct. R. 604(d) (eff. July 1, 2017). As he pleaded guilty on September 7, 2017, and October 7, 8, and 9, 2017, were a Saturday, a Sunday, and a court holiday, his time to file a motion to withdraw his plea expired on Tuesday, October 10, 2017. See 5 ILCS 70/1.11 (West 2016) (when computing time, last day is excluded if it is a Saturday, Sunday, or holiday). Salgado acknowledges that Glennon had not been provided the potential grounds for withdrawing his plea when this period for filing a timely motion expired. However, he argues she should have filed one regardless to preserve his rights and later sought to amend or withdraw the motion as necessary. By failing to do so, he contends she allowed the lapse of his right to appeal.

¶ 50    However, even assuming *arguendo* that Salgado made a substantial showing that Glennon performed deficiently, he cannot establish that he suffered prejudice. Contrary to Salgado's contentions, to establish prejudice for Glennon's failure to file a motion to withdraw a guilty plea, he must show that there is a reasonable probability that the motion would have been granted. See *People v. Beasley*, 2017 IL App (4th) 150291, ¶¶ 29-30; *People v. Gomez*, 409 Ill. App. 3d 335,

339-40 (2011). That requirement applies at the second stage. *Beasley*, 2017 IL App (4th) 150291, ¶ 30.

¶ 51    Salgado claims Glennon should have moved to withdraw his plea where the plea was involuntary due to the effect of his medications. However, the circuit court determined following the third-stage hearing on Salgado's involuntary plea claim, that he failed to prove that his medications made his plea involuntary. As Salgado cannot establish that his plea was entered involuntarily due to his medications, he cannot show that a motion to withdraw his plea on that same ground had a reasonable probability of success. He therefore cannot demonstrate that he suffered prejudice from Glennon's failure to file the motion. See *id.* ¶¶ 29-30.

¶ 52    Put another way, if we were to reverse the circuit court's second-stage judgment and order this claim advanced to the third stage, the court would need to hold an evidentiary hearing. There, to establish prejudice from Glennon's allegedly deficient performance, Salgado would need to prove that a motion to withdraw his guilty plea had a reasonable probability of success because his medications made his plea involuntary. Salgado already attempted to prove that proposition at the third-stage hearing on his other claim. Therefore, reversing the court's second-stage judgment would grant Salgado a second chance to prove something that the circuit court has already determined he failed to prove.

¶ 53    Salgado argues that, due to Calabrese's allegedly unreasonable assistance, the third-stage hearing was "improperly litigated" and therefore cannot dictate whether there was a reasonable probability of success on the motion to withdraw. However, we have determined that Calabrese provided a reasonable level of assistance during the third-stage proceedings and the court's third-stage ruling should be affirmed. Having done so, in the interests of judicial economy, we will

affirm the circuit court's second-stage ruling rather than remand for the court to hold another third-stage evidentiary hearing on an issue it has already decided.

¶ 54    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 55    Affirmed.